THE PEOPLE OF THE STATE OF NEW YORK on the relation of the Schenectady Astronomical Observatory, Respondents, v. WILLIAM F. ALLEN, Comptroller of the State of New York, Appellant.

An act of the legislature, appropriating moneys, from the capital of the common school fund, to the establishment of an astronomical observatory, is in violation of the Constitution (article 9), and void.

Although such appropriation is in the form of a loan or investment, it is none the less unconstitutional, when the specified security is entirely inadequate and the act, in its practical effect, would be a donation of the money.

It is not enough to render a law constitutional that its language should be in such form as to comply with the requirements of the Constitution; it must comply with them in substance.

April 18th, 1868, an act was passed by the legislature of this State, entitled "An act to incorporate the Schenectady Astronomical Observatory," providing for an incorporation under that name, and directing the comptroller to loan to the corporation $60,000 of the capital of the common school fund, to be "secured by a mortgage upon the said observatory and site." It appearing that the specified security was entirely inadequate, the comptroller refused to make the loan.—*Held*, that the act was unconstitutional and void, as impairing the common school fund; and the refusal justified.

Statement of case.

*Held*, further, that the subject of this loan not being expressed in its title, the act was in violation of section 16 of the third article of the Constitution and void for that reason.

(Argued March 30th, 1870; decided June 22d, 1870.)

Appeal by the defendant from an order of the Supreme Court, at General Term, in the fourth district, affirming an order of the Special Term, awarding a peremptory mandamus against the defendant, which commanded him, forthwith, to loan to the relators the sum of $60,000, out of the capital of the common school fund of the State, upon the delivery of the mortgage executed by the relators, referred to in the moving papers.

The legislature, by an act passed April, 1868, entitled *"An act to incorporate the Schenectady Astronomical Observatory,"* constituted fourteen persons, named in the act, a corporation, by the name and style of "The Schenectady Astronomical Observatory," "for the purpose of establishing and maintaining an Astronomical Observatory in the city of Schenectady, and authorized them, and their successors, to take by purchase or otherwise, and to hold and convey, or otherwise dispose of, any real or personal estate for the purpose of the incorporation, the annual income of which should not, at any time, exceed the sum of $10,000."

The second section appointed the fourteen persons named the trustees of the corporation, with power to fill any vacancies which might occur in their number; with further power to make such by-laws as might be necessary, and not contrary to law, relative to the management and disposition of the estate and concerns of the corporation, and provided that eight of the trustees should constitute a quorum.

The third section declared that, "the board of trustees of Union College, in the city of Schenectady, are hereby authorized to allow the said corporation, hereby created, to establish, upon the premises belonging to said college, the astronomical observatory contemplated by this act; and to that end, the said board of trustees of the said college, for a nominal con-

sideration, may grant and convey suitable and proper grounds, in the position, and of the dimensions, to be determined by the board of trustees of said college, for the erection and accommodation of the said observatory; and in consideration of the grant of the site aforesaid, and such other gifts of library and apparatus as may hereafter be made by the said college, the faculty of the said college shall be entitled to the use and enjoyment of the said observatory, free of charge; and the students at a reasonable charge, to be fixed by the trustees of said observatory, except that the said board of trustees of Union College, subject to the approval of the trustees of the said observatory, shall, at their own proper expense, provide a suitable person to have the charge and care of the said observatory and grounds."

The *fourth* section provided, that " whenever the said board of trustees of Union College shall execute a good and sufficient conveyance, to the trustees of the observatory aforesaid, of suitable grounds for the erection of the proposed observatory building, and said conveyance shall have been recorded in the Schenectady county clerk's office, and such record certified to the comptroller of the State of New York, under the seal of the county clerk of Schenectady county then the comptroller is hereby authorized and required to loan, to the aforesaid trustees of the Schenectady Astronomical Observatory, the sum of $60,000, out of any moneys in the treasury belonging to the capitol of the common school fund; to be paid in ten equal annual installments, with annual interest on all moneys unpaid, at the rate of seven per cent per annum, provided the said loan shall be secured by a mortgage upon the said observatory and site, to be executed by the trustees of the said observatory to the said comptroller; and the said mortgage shall be the first incumbrance or lien upon said property."

There were no other provisions contained in the act, except that it should take effect immediately.

After the corporation was organized, it received from the trustees of Union College a conveyance of about four acres

of ground, being part of its college grounds, for the purpose of erecting the observatory thereon, at a nominal price, specified in the deed, of $5,000; and which deed was made pursuant to the provision of the act. The deed was recorded, and a certificate thereof, together with the mortgage of the trustees of the observatory executed to the comptroller upon the premises so conveyed by the trustees of the college, to secure the payment of the $60,000, and a certificate that there was no prior lien or incumbrance thereon, were presented by the trustees of the observatory to the defendant, as such comptroller, and a demand was made of him to loan and advance to the said trustees, upon that security, the said sum of $60,000. There was no bond offered to the comptroller or any other security for the proposed loan, except the said mortgage. The papers before the Special Term in opposition to the motion showed that the land conveyed by the mortgage would not, including the fee simple of it, exceed in value the sum of from $4,000 to $6,000. That an observatory adequate and ample for all the purposes of teaching astronomy to the students of the college could be built and equipped for $25,000. That the observatory, if erected, would add but little to the value of the property, as a security for a pecuniary obligation, and that, upon a foreclosure sale of a mortgage thereon, the premises with the observatory thereon would not bring one-third or one-half the cost of the building. That there would be no competition at such a sale, as the building would be unsuitable for any other purpose; and that the State would be compelled to buy the premises, unless it should be thought best to suffer the same to be purchased by the trustees of the college at their own price, and that, if the State should become the owner, it could not resell the same without sustaining great loss. That the relators had no endowment fund, or capital of any kind, except the land, or means of manning, maintaining and supporting the observatory when built, or any means to pay either the principal or interest of the proposed loan; and that the observatory could never be made pecuniarily remunerative, or to pay any part of the

expenses of maintaining it, or of the interest or principal of the loan. The facts set up in opposition to the motion were not, nor were any of them, denied on the part of the relators, but they claimed, inasmuch as the legislature had declared that the loan should be made upon the security of the mortgage, that the comptroller had no right to inquire or determine whether the mortgage would, or would not be adequate security for the loan ; but that he was, at all events, bound to obey the directions of the act, and make the loan upon that security.

The Special Term. ordered the peremptory mandamus to issue, from which order the defendant appealed to the General Term, where the order was affirmed, and the defendant appealed therefrom to this court.

*Marshall B. Champlain*, attorney-general, for the appellant, as to the constitutionality of the act cited *People* v. *Board of Ed. of Brooklyn* (13 Barb., 400); *People* v. *Hills* (35 N. Y., 449); *Town of Fishkill* v. *F. & B. P. R. Co.* (22 Barb., 634); 38 N. Y., 193; 53 Barb., 70.

*Francis Kernan*, for the respondent, to the same question, cited *Sun Mut. Ins. Co.* v. *Mayor of New York* (4 Seld., 241); *Conner* v. *Mayor of New York* (1 id., 285); *Mosier* v. *Hilton* (15 Barb., 657); *De Camp* v. *Eveland* (19 id., 81); *Brewster* v. *City of Syracuse* (19 N. Y., 116); *People* v. *McCann* (16 id., 58).

FOSTER, J. It is objected, on the part of the appellant, 1st. That, by the true construction of the statute in question, the comptroller was not bound to make the loan (irrespective of the question whether the act was constitutional) until after the erection of the observatory by the relators ; and, 2d. That, in any event, there was no legal liability on the part of the State to loan the money, notwithstanding the passage of the law ; and that, at most, the State, by the law, has only *authorized* the comptroller, as its agent, to make the loan, and

that in the exercise of that authority he had a discretionary power, which the court would not control by mandamus.

I think that neither of these points are well taken. The act declares, whenever the conveyance of the site shall be made to the relators and certified as required by the act, that then the comptroller is not only authorized, but required, to make the loan upon the security of the mortgage. It is true that the mortgage is to be upon the *observatory and site;* but it was not necessary, therefore, that the observatory should be built before such a mortgage could be given. The legislature, doubtless, supposed that the relators would faithfully expend so much of the $60,000 to be loaned as would be necessary to complete the building, and trusted to their honor that it would be done; and there was no reason, under such circumstances, why the observatory to be erected should not be, in terms, included in the mortgage; and, besides, a mortgage upon the land alone would include any permanent erection thereafter to be placed thereon; and, at all events, if any ambiguity existed in that respect, it was controlled, I think, by the express direction of the act, that when the certificate and mortgage were presented to the comptroller he should then make the loan.

No question is made but that the mortgage was executed, and the certificate given, in precise conformity to the language of the statute in question, and if the act did not violate any provision of the Constitution, it was mandatory and required the obedience of the comptroller. The cases to show that a mandamus will not issue, in cases supposed to be like this, do not apply. In *People* v. *Mayor, &c., of New York* (25 Wend., 680) the mayor and common council were indebted to Lynch for salary as a judge, pursuant to a statute, and which required the common council to pay it. And the question was whether he must pursue his remedy by action (which he might have done), or by mandamus, as he did; and the court held, that he had a legal right of action, and must recover his salary in that form, and that mandamus could not

HAND—VOL. III.      52

be allowed as a substitute for an action to recover money legally due.

In *Reeside* v. *Mather* (11 How. U. S. Rep., 272) the decision was, that when a verdict was recovered by the defendant against the United States, plaintiff in the action, a mandamus would not lie to compel the secretary of the treasury to credit the amount to the defendant on the books of his department, and to pay him the amount; the more especially as no appropriation had been made for its payment; and that the verdict merely laid the foundation for a *scire facias*.

The case of *The People* v. *The Contracting Board* (27 N. Y., 378) only decided that when the statute required the contracting board to award contracts for repairs to "the lowest bidder who will give adequate security," and it having made an award, a lower bidder, who has given the security required, is not entitled to a mandamus; but that he was entitled to damages, if anything, for refusing him the contract; and that the contract being already let to another, it could not then be let to the relator.

And in *The People* v. *The Contracting Board* (33 N. Y., 382) the court, when a party claimed that he was lowest bidder for a contract, and the board rejected his proposals as being deceptive and fraudulent, *held*, that mandamus would not lie, because the law had committed to the judgment of the board the decision of the question as to what bids were most advantageous to the State; and that the legislature had given them full authority, whenever, in their opinion, proposals made were excessive and disadvantageous to the State, to decline them; that when they contracted it should be with the lowest bidder; but that *that* did not imply that the lowest bidder could invoke the powers of the court to compel the board to enter into a contract with him.

The only remaining questions are, 1st. Whether the act in question is void as being in conflict with article 9 of the Constitution of the State; and, 2d. Whether it is in conflict with section 16 of article 3 of that instrument.

Article 9 commands that the capital of the common school

fund shall be preserved inviolate, and that the revenues of the said fund shall be applied to the support of common schools.

It is claimed for the relators, if the consideration upon which the legislature proposed to base the loan in question is to be inquired into, that it doubtless took into consideration the fact that the money was to be loaned and used for the purpose of increasing the means of education in the science of astronomy, and that such use should be taken into account in determining the extent of the security or benefit the State would receive for the loan. I think, however, that it is without force in the direction in which it is sought to be applied, while on the other hand, if the legislature did consider that as any inducement for the loan, and a substitute for pecuniary security, it was in that respect a violation of the Constitution, which directs that the income of the common school fund shall be applied to the support of common schools. If such a consideration would be good in part, it would, for the same reason, be good, if standing alone, and the consequence would follow that the legislature might loan the whole school fund for such purposes upon that security only, and thus entirely divert the school fund to the purposes of science, or to any other purpose, which the legislature might suppose formed an equivalent for pecuniary security.

The legislature may donate any portion of the general fund of the State, or loan it upon any kind of security which it chooses, and such donation or loan will be valid, provided the act be framed and passed pursuant to the requirement of the Constitution. But it will hardly be contended that it can pass a valid act, in the *form* of a donation, which shall diminish the capital of the school fund, or that an act would be constitutional which should in terms authorize a loan of $60,000 of that fund for a term of years upon the security of a mortgage, or bond and mortgage, in the total amount of $6,000.

The act in question is sought to be likened to acts which have been passed, authorizing the capital of this fund to be

invested in stocks of this State, of the United States, and of the cities of New York or Albany, as the comptroller and the superintendent of common schools should deem most. advantageous to the school fund, or in bonds and mortgages, in such sums and in such manner as they should deem most advantageous to the fund. I fail to discover any similarity between those cases and this. In all those cases, the comptroller and superintendent have the choice as to which of the securities they will prefer, and are entirely uncontrolled as to the rate at which they will receive such stocks and the amount of security which they will require on loans upon bond and mortgage, and they are in all cases called upon to see to it, as far as they can, that the security taken, whether stocks or bonds and mortgages, is ample; and they are officially responsible for a faithful execution of their trust in each particular loan. And no loss has ever yet occurred on any loan invested in such stocks; and the losses sustained in the loans so made on the security of bond and mortgage have been in the aggregate quite small.

But suppose those acts had required the comptroller and superintendent to invest the school fund moneys in any of the above mentioned stocks, paying for them ten times their nominal amount, or ten times as much as their then market value. Or that they should invest it on mortgage, or on bond and mortgage, taking such security for one-tenth of the amount of the loan, or should require that the mortgage should be made upon real estate, the value of which should be equal only to one-tenth of the amount loaned. There would be much similarity between such acts and the one in question, and no doubt, I think, would be entertained that they were in conflict with the provision of the Constitution which prescribes that the capital of the common school fund shall be preserved inviolate.

It is idle to claim, because the legislature passes the act in such language that the transaction assumes the *form* of a loan, that it is any more binding, if it necessarily impairs the capital of the school fund, than it would be if, in terms, it

declared the intention to donate the amount, or showed in direct language, on the face of the act, that it was intended to loan it upon a security which it knew to be entirely inade- quate. It is not enough to render a law constitutional, that its language should be in such form as to comply with the requirements of the Constitution, but it must comply with them in substance. Can it be true that this loan is valid because the legislature have, in form, assumed to consider that the security was sufficient; and that the comptroller had no right to refuse to comply with its provisions, and that consequently the courts have no power to declare it void? Suppose, instead of $60,000, the amount to be loaned had been fixed in the act at $600,000, upon the same amount of secu- rity which was required, being the observatory and site in ques- tion. Or suppose that the act had required that the more than seven millions of dollars belonging to the capital of the com- mon school, literature and United States deposit funds should all be called in, and loaned to Union College to enable it more fully to aid in extending education in the higher branches, upon the security only of a mortgage on its college ground and build- ings thereon; would any one doubt that the act was in con- flict with the Constitution, and was directly calculated to seriously impair, and almost wholly to destroy the capital of all those funds?

The cases supposed would show more glaringly their unconstitutionality than does the one in question, but only because the amount of loss which the funds would sustain would be much greater. And yet, if the act of 1868 is con- stitutional, those would be also; and if they would be void, necessarily that of 1868 would be so; for all alike are neces- sarily calculated to impair the funds to which they relate; and it is quite as certain that the act under consideration will, if acted upon, impair the common school fund to nearly or quite the whole amount of the loan, as would the acts supposed impair the funds to which they relate to a much larger amount. And if the comptroller and the courts can-

not inquire into and determine the constitutional validity of this act, it could not be done in the cases supposed.

The true question for us to determine is, whether the car-rying out the behests of the act in question would necessarily involve the parting with the $60,000, without adequate secu-rity for its repayment with interest, and thus impair the capital of the fund. And, if such would necessarily be the consequence, then it is entirely immaterial whether the legis-lature called it a loan, or whether they called it a donation. To be valid, it must provide for a real loan, upon terms which would insure at least strong probability of repayment of the principal and interest. And it is no answer to this to say that, inasmuch as this is in the *form* of a loan, we must wait to ascertain whether any loss is sustained, and if so, the school fund must be replenished from other funds to be pro-vided for that purpose.

Now, is there the least probability, if this loan is made, that any considerable portion of it will ever be paid by the Schenectady Astronomical Observatory? The trustees of the observatory are, doubtless, what is claimed for them, all honorable men; but what that has to do with the furnishing funds by them for the repayment of this loan, I am unable to discover. They have neither offered their pecuniary responsibility nor their honor for its repayment. And should there be no money belonging to the corporation to that end, and we should appeal to the honor of the trustees for pay-ment, they might well say, that they became such trustees for the benefit of science; that their trust has involved them in much personal expense of time and trouble; that they have honestly applied the whole amount of the fund to the pur-poses of the institution; and that there is much more pro-priety that the State at large, which may have been benefited by the increased facilities for acquiring a knowledge of the science of astronomy, should, as a State, bear the expense of restoring the deficiency to the school fund, than they, to whom the State, with full knowledge of the extent of their obligation, intrusted the money for the purposes plainly

specified in the statute. There is no security then, in the honor of the trustees. No part of that is pledged to the State toward repayment, unless, as such trustees, they become possessed of the means. And their honor will not be tarnished if the same is never repaid.

The pecuniary security required by the act is scarcely more. The papers, on the part of the defendant, show that upon the data given therein, there can, at most, be pecuniary security to an amount not exceeding $6,000, or one-tenth of the amount of the loan, and no one has claimed here, or in the courts below, so far as anything from either side in the case shows, that there is any real security beyond that amount. There is no personal responsibility; no endowment; no funds, and no means to acquire any by the operations of the observatory. And the land is so held, and so much of the money loaned as may be vested in an observatory so invested, as that the property would be unfit for any other purpose; and for that reason, almost entirely unsaleable for the purpose of repayment of the loan. And yet, the most important element to prove that the pecuniary security is quite worthless has not been adverted to; and that is, that doubtless the deed, from the trustees of Union College to the trustees of the observatory, contains the reservation, or at all events, the act in question does, that " in consideration of the grant of the site aforesaid, and such other gifts of library and apparatus as may hereafter be made by the said college, the faculty of the said college shall be entitled to the use and enjoyment of the said observatory, free of charge, and the students at a reasonable charge, to be fixed by the trustees of said observatory; except that the said board of trustees of Union College, subject to the approval of the trustees of the said observatory, shall, at their own proper expense, provide a suitable person to have the charge and care of the said observatory and grounds." This provision in the law overrides and controls any mortgage which may be made in conflict with it, if such had been the case, and will, for all time, if an observatory is erected on

those grounds, confirm to the college, in whose hands soever the observatory may be, the free use therein provided for. And with such reservation, including that of having the charge and care of the observatory and grounds, is there any sum too small to represent the whole amount which the property would bring at a forced sale by the State upon the mortgage? The case also shows, that the amount which the act required to be loaned by the comptroller, is far greater than would be needed for the purposes of completing and furnishing such an observatory as would be necessary or useful. And the legislature seems, in the form of a loan, in fact to donate to the observatory, not only enough for its completion and to fully equip it, but also sufficient to defray all its expenses for several years.

The case of *The People* v. *The Board of Education of Brooklyn* (13 Barbour, 400), furnishes an illustration of the rule, that we are not to hold this a case of loan, with security, merely because the legislature has chosen to call it so. An act of the legislature, passed March 7, 1848 (chapter 76), provided, that "the orphan asylum societies of the city of Brooklyn shall participate in the distribution of the school moneys raised in said city, in proportion to the number of children, between the ages of four and sixteen, who have been under the charge of said societies during the past year, and instructed in such manner as is usual in common schools; and shall, thereafter, be annually entitled to such distributive share, in the same manner, and to the same extent, as is now, or shall be provided in respect to the common schools of said city." The act also placed the said schools under the general supervision of the board of education of the city, but under the immediate direction and management of the said societies as theretofore.

In construing that act, the court held that they were not common schools, and were not entitled under it to the school moneys; and, in the opinion, BARCULO, J., said: "To say that the legislature can determine what institutions shall receive the proceeds of the school fund, and that whatever

they determine to be entitled thereto becomes, *ipso facto*, a common school, is begging the whole question and annulling the constitutional restriction.   For if this were so, they might, by a simple enactment, convert all our colleges and academies, and all other seminaries, into common schools. This cannot be tolerated.   The courts must interfere, and preserve the Constitution.   All experience shows that the legislature will not."

Now, in my judgment, the act in question made the transaction a loan with security, just as much, and no more, than the act of 1848 made the schools therein referred to common schools.   And the act of 1868 was passed in violation of the ninth article of the Constitution, and was not binding upon the comptroller.

And, *second*. It is manifest, I think, that the act also violates section 16 of article 3 of the Constitution, which says: " No private or local bill, which may be passed by the legislature, shall embrace more than one subject, and *that* shall be expressed in the title."

In support of the proposition that the act does not violate that provision, the following cases are cited:

*Conner* v. *The Mayor, &c., of New York* (5 N. Y., 285.)  In 1847 an act was passed entitled " An act in relation to the fees and compensation of certain officers in the city and county of New York," by which salaries were given to the surrogate, clerk of the Superior Court, register, and clerk of the city and county of New York, instead of the fees to which, by law, they were entitled ; and requiring them to receive such fees, and to pay them into the treasury of the city and county. And the court decided that, although four officers were provided for by the act, it related to only one subject, to wit: the fees of the officers ; and that the act was not private or local within the meaning of the Constitution.

*The Sun Mutual Insurance Company* v. *The Mayor, &c., of New York* (8 N. Y., 241); where the question was, whether the act entitled "An act to enable the supervisors of the city and county of New York to raise money by tax,"

passed March 23d, 1850, violated that provision. The act, in one section, authorized the supervisors to raise by tax several amounts of money, but all of them were to be applied to defraying expenses strictly municipal, and the court held that the one subject of the act was the raising the moneys by tax, and that the act was constitutional.

*Mosier* v. *Hilton* (15 Barb., 657), involved the question whether the act passed March 28th, 1850, entitled " An act for the relief of the creditors of the Lockport and Niagara Falls Rairoad Company," was in violation of that provision. The Lockport and Niagara Falls Railroad Company was in debt, and some of its creditors had judgments against the company, and the object of the act was to provide as large means as could be raised for the payment of the creditors by a sale of the property, rights and franchise of the company. The act authorized a sale of all its property and franchise, and that the proceeds should be applied to the payment of its debts, and if there was any surplus, that it be divided among the then stockholders. And the act was held to be constitutional. The cases of *De Camp* v. *Everland* (19 Barb., 81) ; *Brewster* v. *City of Syracuse* (19 N. Y., 116) ; *The People* v. *McCann* (16 N. Y., 58), are also cited in support of the same proposition. Without analyzing them here, it is sufficient to say that, upon a careful examination of them, I do not find that they tend to establish the validity of the act now in question. In each of them the intent was to accomplish a single main object, which was well expressed in the title, and nothing was included in the act which was not necessarily a part of the subject so expressed.

The cases of *The Town of Fishkill* v. *Fishkill and Beekman Plank Road Company* (22 Barb., 634) ; *People* v. *Hills* (35 N. Y., 449) ; *The People* v. *O'Brien* (38 N. Y., 193) ; and *The People* v. *Commissioners of Highways of the Town of Palatine* (53 Barb., 70), are analogous to the one under consideration, and the decision in each of them furnishes authority that the act of 1868 is in conflict with the sixteenth section of article 3. And we cannot hold that act to

be valid without direct conflict with the decisions of this court in *The People* v. *Hills* and *The People* v. *O'Brien.* In *The People* v. *Commissioners of Highways of the Town of Palatine*, it appeared that an act was passed, entitled "An act to *regulate* a road in the town of Palatine, Montgomery county," (Laws of 1868, chapter 687), which directed the commissioners to *alter* and *reduce* the road between certain points to the width of three rods, and charge the expense of the alteration upon the land owners to whom the abandoned portion of the road would revert. John A. Failing, one of the persons to whom, if the width of the road was reduced, a portion of the land would revert, obtained an order at Special Term for a peremptory mandamus to compel the commissioners of highways to reduce the width of the road in conformity to the act. The commissioners appealed to the General Term, and that court held, that the *subject* of the act was not *expressed in its title*, as required by section 16 of article 3 of the Constitution, and that the act was an attempted fraud upon the public rights, and was null and void. And it also held that the act donated the land to be abandoned to individuals. And the court, in the opinion by POTTER, J., said: "The words employed in the title, ' *to regulate* ' are not only inappropriate but deceptive. The words in the enactment are ' *to alter and reduce the width*,' expressing an entirely different idea. The title gives not the locality, distance or object to be accomplished. The fraud is too apparent to be tolerated; it is too miserably bungling, in every feature, to succeed. The act is local. The subject is not fairly or honestly expressed in the title, but carefully avoided. That the act was conceived in fraud, and its title designed to defraud, its extraordinary provisions, and the attempted action under it is practical and confirmatory evidence."

Now if the words " *to regulate*," in the title of an act, are not sufficient to cover an enactment directing the narrowing of a highway, or if that is not the *regulating* of it, it is quite clear that the words "to incorporate," do not cover an enactment which requires the comptroller, after the incorpo

ration is completed, to loan to it, either upon sufficient or insufficient security, the sum of $60,000.

It seems to have been supposed, because an astronomical observatory cannot be erected without pecuniary means, that, for that reason merely, a provision in the act by which the State shall furnish the means is a proper part of the act of incorporation. But this, I think, is a gross mistake, and one which, if countenanced, would lead to much more loose legislation hereafter than has yet obtained, and of which it would seem there has been quite as much as is desirable. It is true that money is needed to build observatories, but that does not show that it must be provided in the act of incorporation. Acts of incorporation, when confined to their legitimate action, confer all the *power* necessary to enable the corporation to carry out its proper purposes; but it has, in the case of private corporations, as this was, nothing to do with providing the means. It enables the corporation to make such valid contracts as it shall find to be necessary, but it does not properly include the making of the contracts.

The title of an act *"to incorporate"* the trustees of an observatory, would no more lead one to suppose that it con- tained an enactment that the State was to supply the means to build it, either by gift or loan, than it would that it required some individual to do so out of his own private means. The whole object of an act of incorporation is to give the artificial person an existence, and to enable it to control and to protect its rights; but it would be rash to say that an enactment compelling the State to donate to it, or to loan it money, after the incorporation was complete, was any proper or appropriate portion of such act of incor- poration.

I think the title of the act in question was deceptive, and calculated to mislead all concerned in regard to the main purpose of it, which was to obtain $60,000 from the treasury without any adequate security for its repayment.

The order of the General Term and of the Special Term should be reversed, with costs to the defendant in the court below, together with his costs of this appeal.

All concur for reversal, except HUNT, J., who did not vote. Orders reversed.