# SUPREME COURT.

THE PEOPLE *ex rel.* TIMOTHY F. BUSH agt. WILLIAM L. THORNTON.

*Office and officer — Quo warranto to try title — What acts and promises of a candidate for office will invalidate his right thereto — Office not necessarily to be given to the qualified person having the next highest number of votes.*

At a general election held in and for Sullivan county, the relator and the defendant were the two and only two candidates to be voted for in that county for the office of county judge. The whole number of votes cast was 6,179; of which defendant received 3,211, and the relator received 2,947. The certificate of election was given to the defendant by the board of county canvassers, and on January 1, 1879, he took possession of the office, having first taken the oath required by the Constitution and filed the necessary bond. The term of office was six years, and the salary as fixed by law was $2,500 per annum. The defendant after he became a candidate for the office, and during the whole canvass, down to the day of election, published and circulated throughout the county a promise addressed to the electors to this effect: " That if elected to the office of county judge I will pledge myself to take only $1,200 a year for my services; that I will pay out of my own pocket the coal necessary to heat my law office; that I will pay for all stationery and letter heads, and will see that persons needing blanks pay for them themselves, and if a member of assembly can be elected who will have the law amended reducing the salary to $1,200, I will guarantee to waive all constitutional objections and never question its validity:"

*Held*, that this was sufficient to invalidate the defendant's right to the office he now holds.

The promises and pledges of the defendant were made to the taxpayers and electors generally, and were of a character, within the fair spirit and meaning of the acts, impliedly prohibited by article 12, Constitution of this state.

It is not necessary that there should be evidence from any witness who voted at the election for defendant, that he did so in consequence of such pledges and promises. The illegal promises to induce votes having been affirmatively shown to have been made to every elector, more particularly to every taxpaying elector, the *onus* of showing the numbers of votes that were influenced thereby, should devolve upon the defendant, and it should devolve upon him to show the number of votes uninfluenced by such promises he did actually receive.

---

The People *ex rel.* Bush agt. Thornton.

---

An offer of a bribe is criminal, and this is so whether the offer is accepted or not.   It disfranchises the party making the offer as well as the party influenced thereby:

*Held,* also, that the relator is not entitled to the office.   He did not receive a majority of the votes of the legal electors who at that election cast ballots for the office of county judge, and consequently was not elected.

*Sullivan Circuit, December,* 1880.

ACTION of *quo warranto* tried at the Sullivan circuit in May, 1880.   The facts will sufficiently appear in the opinion.

*Hon. T. F. Bush* and *Benj. Reynolds, Esq.,* for relator

*Jas. L. Stewart* and *C. V. R. Ludington, Esqrs.,* for defendant.

OSBORN, *J.* — The pleadings in this case are very voluminous, but the important facts can be briefly stated.   These are really undisputed, and for that reason counsel in open court consented that I might take the case from the consideration of a jury and thus give to it such an examination as its importance seemed to demand.

At the general election held in and for the county of Sullivan, on the 5th day of November, 1878, the relator and the defendant were the two, and only two, candidates to be voted for in that county for the office of county judge.   The whole number of votes cast for such office was six thousand one hundred and seventy-nine (6,179).   Of these the defendant received three thousand two hundred and eleven (3,211), and the relator received two thousand nine hundred and forty-seven (2,947).   The certificate of election was given to the defendant by the board of county canvassers, and on the 1st of January, 1879, he took possession of the office, having first taken the oath required by the constitution and filed the necessary bond.   The term of office was six years and the salary as fixed by law was $2,500 per annum.   The defendant was nominated by the greenback county convention held Sep-

tember 20th, 1878, and the relator was nominated at the democratic county convention held October 15th, 1878. At the greenback convention the following resolution was adopted :

"*Resolved*, That the salary of the county judge should be reduced to $1,250; of member of assembly to $750; of school commissioner to $600; of special county judge to $200; county clerk's fees should be reduced fifty per cent."

The defendant accepted the nomination with full knowledge of this resolution, and very soon thereafter caused to be printed and published in two newspapers of the county a very lengthy circular — to be found in the complaint at folio six to eighteen inclusive — addressed "to the overburdened taxpayers of Sullivan county." This document is too lengthy to be here inserted. It is an effort to show in a variety of ways, and by different processes of reasoning, that the legal salary ($2,500) was grossly excessive in amount, and is a most earnest and powerful appeal to *these* " *overburdened taxpayers* " to support the nominees of the greenback convention, who would discharge the duties of the various offices mentioned in the resolution and for the sum therein named.

Perhaps all that is of particular importance in this lengthy circular is the following :

"William L. Thornton has accepted the nomination of county judge, and should he be elected will pledge himself to take from the county $1,200 only of the salary now allowed by law ; and if a member of assembly can be elected who will have the law amended reducing the salary to $1,200, the said Thornton will guarantee to waive all constitutional objections and never question its validity."

After causing this circular to be printed and published in the newspapers, he procured the same to be printed in the form of a large handbill, and to be generally distributed and circulated among the electors of the county.

A day or two after the democractic convention was held, and which nominated the relator, the defendant caused to be printed and published in the two newspapers printed and pub-

lished in the county, a communication over his own signature, a portion of which is as follows:

"MONTICELLO, 16*th October*, 1878.

"*To the electors of Sullivan county* — I here repeat that if elected to the office of county judge I will pledge myself to take only $1,200 a year for my services. That I will pay out of my own pocket the coal necessary to heat my law office. That I will pay for all stationery and letter heads, and will see that persons needing blanks pay for them themselves. If, by so doing, I have committed a criminal offense, let judge Bush make the most of it by lodging a complaint against me before the next grand jury.

Has heaping on taxes become a virtue in this county, and an attempt to reduce them become a crime? Let the people answer.

WILLIAM L. THORNTON."

A week or so before the election, the defendant with two sureties executed and acknowledged a written bond and caused the same to be published in the four newspapers aforesaid, conditioned as follows:

"Whereas, the above bounden W. L. Thornton has been placed in nomination for the office of county judge, agreeing to pledge himself if elected to perform the duties of said office for the sum of $1,200, the balance of $1,300, should the supervisors persist in raising the same, shall be turned over to the poor fund to the credit of the county."

The bond further recited that if this agreement was kept then the obligation was to be void, otherwise the county treasurer of the county, and his successors in office, were authorized to prosecute the same for the benefit of the people of the county, to recover any excess which the said Thornton might take for salary over and above the $1,200.

It was dated and acknowledged October 28th, 1878, and was signed by the said Thornton as principal, and by C. V. R. Ludington and G. B. Wales as sureties.

The People *ex rel.* Bush agt. Thornton.

It was in the penal sum of $10,000, and the sureties were men of high standing and well known financial responsibility throughout the county.

The facts further show, that the promises and pledges of the defendant were published and kept prominently before the electors and taxpayers, during the entire political campaign, by the newspapers that supported him ; by the circular, letter, and bond, above referred to and set forth, as well as by speeches made at political meetings all through the county addressed by the defendant and others; that these promises and pledges became known to nearly if not all the electors in the county, is entirely obvious.

It is also apparent that all these acts of the defendant were done for the only purpose of influencing votes in his favor for the office of county judge.

And here let me say, that I do not charge that the defendant believed that these acts or pledges, or any of them, were illegal, or that they could be claimed to impair his title or right to hold the office and discharge its duties in the event of an election. Nor is it necessary to the decision of this cause that I should find that the oath of office was not honestly or conscientiously taken by him under the belief that the promises and pledges he made were not illegal and in violation thereof.

It may be that the convention which passed the resolution, and the incumbent who indorsed it and made the promises, pledges and bond above referred to, did so upon the honest supposition that the public interests demanded a reduction in the salary of county judge.

It is safe to go still further and assume, for the purposes of the argument, that the salary fixed by law was excessive. This can make no difference in the conclusion to be arrived at. The law has provided a way to correct the wrong, but it could not be done in the manner undertaken by the defendant and his supporters.

This brings us to consider the two legal questions presented,

which are: First. Whether the acts complained of invalidate the defendant's right to the office he now holds; and, second, if so, is the relator entitled thereto?

By the constitution of this state, as amended in 1869, additional jurisdiction, and with it additional labor and dignity were conferred upon the county courts (*Article VI, sec.* 15).

By this amendment the term of office of county judge was increased from four to six years (*Sec.* 15). The salary was to be fixed by law and not by the board of supervisors, as formerly.

In addition to the powers formerly exercised, the county court (*sec.* 15) was given original jurisdiction in all cases where the defendants resided in the county and the damages claimed do not exceed $1,000. The county judge by this amendment is given power to hold county courts, and to preside at courts of sessions in any of the counties of the state, except New York and Kings. By section 21, in two or three counties of the state, he is prohibited from practicing as an attorney or counselor in any court, or acting as referee. He is also to preside at all courts of sessions in his county, and in which court nearly all criminal causes are tried, except murder and arson in the first degree. In the county of Sullivan he is also to perform the important duties of surrogate.

Thus it will be readily seen how important and responsible are the duties a county judge is called upon to perform. Its incumbent should be a lawyer of conceded ability and legal learning; a man of unquestioned honor and integrity. He should receive for his services a fair, liberal salary to be fixed by law, and not by the constantly changing views of a board of supervisors, or the action of any political convention. This is regarded as of so much importance that the constitution of the state expressly prohibits even the legislature from diminishing the salary allowed by law so as to affect a present incumbent.

At the time of the defendant's election, and on January 1, 1879, when he entered upon the duties of his office, the salary

of the county judge of Sullivan county was fixed by law at
$2,500 per annum. But before the defendant could assume
to act he was obliged within the time fixed by law to take the
oath of office prescribed by the Constitution. This is as
follows:

"Members of the legislature and all officers, executive and
judicial, except such inferior officers as shall be by law
exempted, *shall* before they enter on the duties of their
respective offices take and subscribe the following oath or
affirmation: I do solemnly swear (or affirm) that I will sup-
port the Constitution of the United States and the Constitu-
tion of the state of New York, and that I will faithfully
discharge the duties of the office of ———— according to the
best of my ability.

And all such officers who shall have been chosen at any
election shall, before they enter upon the duties · of their
respective offices, take and subscribe the oath or affirmation
above prescribed, together with the following addition thereto
as part thereof. And I do further solemnly swear (or affirm)
that I have not directly or indirectly paid, offered or prom-
ised to pay, contributed, or offered or promised to contribute,
any money or other valuable thing, as a consideration or
reward for the giving or withholding of a vote at the election
at which I was elected to said office, and have not made any
promise to influence the giving or withholding any such vote"
(*Art. XII, Con. of the state*).

Now this was the oath the defendant was required to and
did take. It is not a mere matter of form, an idle, useless
ceremony, but a most solemn act which the Constitution
imperatively required before he could do any official act. A
neglect or refusal to take it would render his election nuga-
tory, and create a vacancy in the office.

It was not until a very recent amendment of article XII of
our Constitution that the latter part of this oath was incorpo-
rated therein. It has well been called an iron-clad oath. The
wholesome provisions of our common law in reference to

bribery; of our statutes and constitutions as they existed prior to this amendment, had all proved abortive to a very considerable extent, in preserving the purity of the elective franchise, and in securing what is so indispensably necessary to the existence of a republican form of government and the perpetuity of our institutions, the free, unprejudiced and unbiased action of the electors.

Our elections were not a fair expression of the public will expressed through the ballot box; but oftentimes a mockery and disgrace in consequence of the corrupting influences and means used. Honesty and competency on the part of those who aspired to places of honor, trust and emolument were often regarded as of far less consequence than the ability of such aspirant and his followers, by illegal means and practices, to accomplish for himself, success, and for his party, a partisan triumph.

This recent amendment was aimed at the very vitals of this monster evil.

Its design was to go further than simply to prevent the illegal offerer and its accepter from the right to vote if challenged; further than the power of the court to throw out the vote so influenced in an action of *quo warranto;* further than the right to punish criminally, which was not affected by this amendment.

It was to prevent, absolutely prevent, the successful candidate for office, who had been guilty of illegal practices; who had been making promises and pledges to influence votes in his favor, such as are directly and indirectly brought within the letter of this obligation, from reaping any of the fruits of his election.

These words "directly or indirectly" as used, should be given their broadest meaning, and so the courts have held.

The promises and pledges of the defendant were made to the taxpayers and electors generally, and were of a character, I think, within the fair spirit and meaning of the acts impliedly prohibited by this constitutional obligation.

Its effect, indirectly at least, is as if he had said to each individual taxpayer "elect me to the office of county judge and you shall receive a certain sum of money or shall be saved from the payment of a certain sum of money."

This sum could actually be named in amount, for it could be easily ascertained what the individual share of each taxpayer should be in the sum of $1,300.

I am aware that there is no evidence from any witness who voted at the election for defendant, that he did so in consequence of such pledges and promises. This I regard immaterial, and so stated at the trial when the relator proposed to give evidence of such a character.

If the defendant had the right to make such offers to influence votes for him; if this was not in violation of the acts impliedly prohibited by the constitutional oath; of the law to preserve the purity of the election franchise, not against public policy, evincing moral turpitude, and so not to be condemned, then it would seem to be absurd to hold that the electors had not the right to be influenced thereby; or that all that can be done is simply to reject the votes of those who would, even if such evidence were permissible, testify that they were so influenced.

The promise was made with that intention, and it is but fair to assume that the object intended by such illegal promises was to some extent at least attained.

The illegal promises to induce votes having been affirmatively shown to have been made to every elector, more particularly to every taxpaying elector, the *onus* of showing the number of votes that were influenced thereby, should devolve upon the defendant, and it should devolve upon him to show the number of votes uninfluenced by such promises he did actually receive (*The People* agt. *Thatcher*, 55 *N. Y.*, 525; *People* agt. *Cook*, 8 *N. Y.*, 67; *People* agt. *Schroeder*, 26 *Ohio St. R.*, 550; *State* agt. *Stevens*, 23 *Kansas*, 456).

Indeed if there was no remedy in this case unless the people could show that a sufficient number of votes cast for the

defendant to overcome his majority had been actually obtained by means of the influence offered, it would be difficult, if not impossible, to correct the evil complained of.

By his own acts this difficulty or impossibility exists in separating the votes cast for him that were or were not influenced by such illegal promises, and therefore the burden of such an undertaking should be upon the person who has caused such difficulty or impossibility.

This, I think, is in accordance with the authorities above cited (*See, also, Matter of Barber,* 10 *Phil. Rep.,* 579, 590, 593; *Duffy's case,* 4 *Brewster,* 533, 549, 561; 2 *Luzerne Legal Register,* 49).

I have thus attempted to show the illegality of these promises and that they are within the acts impliedly prohibited by the Constitution, and that in view of them the defendant could not truthfully take the oath he did, and the question that now naturally suggests itself is, can the incumbent defeat or frustrate the purpose and object which was intended to be accomplished by innocently or corruptly taking the same? Is it sufficient that the defendant should go through the mere form of taking the oath when his own admissions of what he has done, show promises of a character prohibited thereby?

In the case of the *People ex rel.* agt. *William F. Allen, Comptroller,* &c., where the question was, whether an act of the legislature was constitutional or not, the court held "that it is not enough to make a law constitutional that its language should be in such form as to comply with the requirements of the Constitution; it must comply with them in substance. If it evade the terms and frustrate the general and clearly expressed, or necessarily implied, purposes of the Constitution, it is as clearly void as if expressly and in direct terms forbidden" (*People* agt. *Allen,* 42 *N. Y.,* 404). To the same effect *People* agt. *Allison* (55 *N. Y.,* 50). In this last case the court in its opinion makes use of substantially the same language as last above quoted.

I think it must be regarded as self-evident that the defendant can stand in no better position from the fact of his having taken the oath than as though he had not taken it at all. This must be so, if I am right in holding what I do, in reference to the character of the promises and pledges made.

Suppose the Constitution required that the defendant, before entering upon the duties of his office, should take an oath that he was thirty years of age, and he should take it, when in fact he was only twenty-five; could he retain the office simply because he had taken the oath, when the true fact was clearly shown in an action of *quo warranto?*

In an action of this character the title of the defendant to the office he holds becomes an open question, and it must be made to appear to the court that his possession is a legal and rightful one. His certificate of election, his oath taken and filed, are doubtless *prima facie* evidence of his right to hold and enjoy the office.

But this is not conclusive, the whole question is open to investigation (*People ex rel. Judson* agt. *Thatcher*, 55 *N. Y.*, 525). An action of this character is a substitute for the ancient writ of *quo warranto*, a writ of right for the king against one who usurps an office, franchise or liberty, to inquire by what authority he supports his claim in order to determine the right (3 *Bl. Com.*, 262). And in this state the rule is well established that the burden is upon the defendant to show his right, and that failing to do so, judgment must go against him (*People* agt. *Utica Ins. Co.*, 15 *Johns.*, 358; *People* agt. *Pease*, 27 *N. Y.*, 63; *Cole on Quo Warranto*, 221).

It would seem, from what has already been said, that the discussion as to the defendant's rights might safely end here. But as another reason, independent of the one considered can be successfully advanced to invalidate his title, it ought not to go unconsidered in a case so important. And here we are not left to arrive at a conclusion without the aid of judicial precedent and adjudication, as will be presently seen.

An offer of a bribe is criminal (1 *Statutes at Large*, 145, *sec.*

4; *Laws of* 1842, *chap.* 130; 2 *Bishop's Crim. Law, sec.* 98; 1 *Russell on Crimes,* 154; *Wade's Election Code,* 142).

And this is so whether the offer is accepted or not (*See cases above cited, also* 65 *Ill. Rep.,* 61).

By reference to section 2, article 2, of our Constitution, it will be seen that it disfranchises the party making the offer as well as the party influenced thereby.

This section was incorporated into our Constitution, by the amendment of 1874. The language used is important, and therefore a few lines are quoted: " No person who shall receive, expect, or offer to receive or pay, offer or promise to pay, contribute, offer or promise to contribute to another any money or other valuable thing as a compensation or reward for the giving or withholding of a vote at an election, or who shall make any promise to influence the giving or withholding of any such vote, &c., shall not vote at such election."

This same disqualification on account of bribery existed at common law (*Rogers on Elections* [*11th ed.*], 246, 333–335; 2 *Peckwell,* 245, 246).

In the Litchfield case (*1st O'Malley* agt. *Hardcastle,* 26) Mr. justice WILLIS lays down the rule thus: " With respect to bribery the law is perfectly clear. Bribery by common law equally as by act of parliament avoided any election at which it occurred. If there were any general bribery, no matter from what fund, or by what person, and although the sitting member and his agents had nothing to do with it, it would defeat an election on the ground that it was not a proceeding pure and free as an election ought to be, but corrupted and vitiated by an influence which, coming no matter from what quarter, had defeated it and shown it to be abortive."

In the Dublin case (*same volume,* 293) lord KEOGH after commenting upon and approving the remarks of Mr. justice WILLIS above quoted, and also of a statute declaring that a promise to pay the traveling expenses of a voter, conditioned on his voting for a particular candidate, says: " But without this (meaning the statute) I should have thought that such a

promise was an act of bribery from the earliest times, and I have the greatest authority in the law of England for that proposition."

In 1748, lord MANSFIELD spoke against, and defeated a bill which had been introduced into the house of lords, declaring that the payment of traveling expenses to a voter was an act of bribery, by insisting that such a promise was subject to the penalties and therefore no such bill was necessary.

Nor was it necessary that the offer or promise to influence a voter should go to him directly. Thus where a promise was made to influence a voter, to donate $1,000 to a charitable purpose in which the · voter was interested, it was held that this was within the inhibition (*Bradford Case*, 3*d O'Malley* agt. *Hardcastle*, 32; *Horsham Case, same volume*, 52; *Waterford Case, same vol.*, 25; *The Plymouth Case, same vol.*, 107).

Thus it will be seen from the earliest time and long prior to our existence as a nation, the purity of the elective franchise, the free, unbiased, unprejudiced and uninfluenced action of every voter has been regarded as of the most vital importance, and bribery the subject of investigation and punishment.

But it may be claimed that bribery has been punished criminally only when the illegal offer or promise was made to or accepted by some particular individual or individuals. This is probably true.

It may be that the alleged illegal and unconstitutional offers and promises of the defendant to influence votes, were so general in their character that a criminal prosecution could not be expected or sustained. These were addressed to the whole body of electors in Sullivan county, or the taxpaying electors, and it would be idle to suppose that any indictment could be sustained against the whole body to whom the promises were addressed. But as they were made by a single individual for a corrupt and illegal purpose, it is not by any means certain that a criminal prosecution could not be sustained against one making such an offer, if it could be made to appear

that the party knew that the act he was doing was in itself unlawful and prohibited, as has been demonstrated.

For the purposes of a correct decision of this action the court is not driven to any such extremity. The question is, how do these promises affect the defendant's right to retain the office he holds?

If he had said to each individual taxpaying elector of the county, in order to influence votes in his favor: "Vote for me and I will pay you a certain sum of money, or I will see that you are saved the payment of a certain sum of money in your taxes," naming the sum, and which might be just the proportion which each individual taxpayer would have to pay in order to raise the sum of $1,300.; this would clearly be an act of bribery to be punished criminally, and no intelligent man could innocently assume that this did not prevent him from truthfully taking the oath prescribed.

The sum to be paid by, or to be saved to each taxpayer would of course vary in amount, but could be easily ascertained by the most ordinary mathematician by ascertaining the proportion of the entire assessed valuation of such taxpayer to the entire assessed valuation of property in the county.

Instead of making such offers to the taxpayers separately, they were made to the taxpaying electors collectively.

Can it be maintained for a single moment that by so doing he is out from under the condemnation of the law, or that this in any manner prevents or lessens the evil which the law endeavors to prevent?

If so, this in effect would be saying that a wholesale attempt to influence and control the action of electors would be innocent in its character, and though the results arising therefrom might be of the most serious and dangerous character, the successful candidate might peaceably enjoy his office, without any possible disturbance from the courts; while an offer of the same character made personally to a single individual would invalidate his title and subject him to severe punishment.

As before stated these offers were made generally to the

electors; were intended to influence their action, and there is evidence from which it may be inferred that the defendant received a large support from that class to whom the promises were addressed.

While it may not be fair to assume that every elector who cast his vote for the defendant was induced to do so in consequence thereof; it is fair to assume that the effect intended thereby was in some measure attained.

The general principle contended for by the defendant, " that the law presumes every voter to cast a legal vote until the contrary is shown," is correct in principle, and well settled by authority. This principle was fully recognized by me in another *quo warranto* action tried at the same circuit (*People* agt. *Pease*, 27 *N. Y.*, 63, *p.* 74 *opinion*).

The difficulty with the defendant, however, is that for reasons which have been fully stated he can receive no benefit from invoking that principle.

In the case of the *State* agt. *Purdy* (36 *Wis. R.*, 213 ; 14 *Am. Law Reg. No.* 5, 90), the contest was between two individuals as to which was entitled to the office of county judge. The relator claiming it in consequence of the reception of twenty-three more votes than the incumbent. The latter, however, claimed in his answer " that the salary of the county judge was fixed by law at $1,000 ; that the relator being a candidate for the office, published and circulated throughout the county a promise, addressed to the electors, that if elected county judge he would perform all the duties, and furnish an office and all other incidentals except the record books, for $600 per annum during his term ; and that solely by this offer 100 of the voters of the county were induced to vote for the relator, thus securing his election." It was held by the court on demurrer to the answer, in a well considered and carefully written opinion, that this was sufficient to defeat the title of the party making such offer. See *McCrary on Elections* (*2d ed., sec.* 147) where this Wisconsin case is referred to and the doctrines therein approved.

In the case of the *State* agt. *Collier* (*Sup. Court of Missouri*, *reported in vol.* 18, *Am. Law Reg.* [*N. S.*], 768) the following doctrine is held : " Where a candidate for a public office publicly pledged himself to the voters of his district, that if elected, he would perform the duties of his office for less than half the fees allowed by law, and in consequence of which taxpayers were induced to vote for him who would not otherwise have done so, whereby he was elected.    That such an offer and pledge tended to corruption ; was demoralizing in its tendencies and utterly subversive of the plainest dictates of public policy; and that the title to the office thereby obtained was invalid."

In these cases the question arose as in the case at bar, by an action of *quo warranto*, but in neither of these cases cited was the incumbent required to take any oath in which such offers were impliedly prohibited.

But it may be said that the question in each case was raised by demurrer which admitted all the allegations in the pleadings, and among others, that a sufficient number of voters were influenced by the promise to change the result; that it was only necessary to decide in those cases that the votes so influenced were null and void.    This the court did, in each case, judicially determine.    But the whole reasoning of the court goes to the extent of holding the entire transaction a fraud and nullity; a species of bribery clearly against public policy and not to be tolerated.

In the Missouri case the court in its opinions, among other things, says : " It is not necessary to show, as claimed by respondent that he, or those who voted for him, have been guilty of bribery in its strict sense.    In instances involving the freedom and purity of elections, that term possesses a broader significance.    It may properly be employed to define acts not punishable as crimes, but which involve moral turpitude or are against public policy."

In the case of *Tucker* agt. *Aiken* (7 *New Hampshire*, 140), where practice had obtained of putting up at public auction

and of disposing of the office of constable to the highest, and the office of collector to the lowest bidder, the court in pronouncing judgment invalidating the title to the offices so obtained, says : " This has a direct tendency to divert the attention of the electors from the qualifications of the candidates to the terms on which they will consent to serve, and makes the choice turn upon considerations which ought not to have an influence." To same effect, *Alvord* agt. *Collins*, 20 *Pickering* [*Mass.*] ).

In the case of *Canothers* agt. *Russell*, recently decided in the state of Iowa, the facts were briefly as follows, and it will be seen they are almost identical with the facts in this case. At the fall election 1878, in Jasper county, Iowa, the defendant was nominated for the office of recorder and received 102 majority. At the convention that nominated him a resolution was adopted pledging " that the candidate for recorder should pay over and into the county treasury, to the credit of the contingent fund, all his fees in excess of $1,000. The defendant agreed to it knowing that his fees would amount, as allowed by law, to at least $2,000. This was used by defendant and his supporters to influence votes in his favor."

The action was brought by an elector under a provision of the Iowa Code, which provided that an action to contest the title of any incumbent to an office might be brought by any elector, whenever the candidate had given or offered a bribe. The sole question was, whether such an offer was a bribe or an offer of a bribe in such a sense as to invalidate the election or defeat the defendant's title. It was first tried before a court of contest, which decided against the title of the incumbent. From this an appeal was taken to the circuit court, where a trial was had, and with a like result. From this the incumbent appealed to the supreme court of the state, where the judgment of the circuit was affirmed. The judge at the circuit, among other instructions to the jury, gave the following :

*Third.* " If you find from the evidence that the conven-

tion which placed the incumbent in nomination passed the resolution which has been introduced in evidence; that the incumbent then and there publicly indorsed it, and pledged himself to carry out the same; that the resolution was circulated through the county and used as an argument by the incumbent and his friends for the purpose of influencing the electors to vote for him for the office named, *then you are instructed that the incumbent is disqualified from holding the office.*"

This instruction was answered in the affirmative by the jury. It will be seen that in it (the instruction) nothing whatever was said as to whether voters were or were not influenced thereby.

This was affirmed by the supreme court of Iowa, and a very learned and able opinion therein was pronounced by chief justice ADAMS.

So that it will be seen that there has been an entire uniformity in the decisions of the court whenever and wherever they have been pronounced, upon the effect of such promises in impairing the title of an incumbent using the same.

Need I go further — need I speak more fully of the evil consequences that would inevitably result if a different doctrine were to prevail?

If one, in order to obtain his election, may offer to give to the taxpayers directly or indirectly one-half of his legal salary as an inducement for the giving or withholding of votes, he can certainly offer to give the whole of such salary. Nor would it end here. If this can be done; if the courts will tolerate such practices, then there is nothing to prevent an aspirant for any elective office within the gift of the people, in any department of the government — national, state or county, executive, legislative or judicial — from offering to the taxpayers not only to discharge its duties gratuitously, but in addition thereto to promise any amount he may be willing to pay into the national, state or county treasury, for the benefit and relief of such taxpayers, and from no other or

higher motive than thus to influence and corrupt their votes.

It follows, therefore, from what has been said, that the defendant cannot retain his title to the office he now holds; that he is not entitled to the benefit of the votes that were cast for him, and that a judgment of ouster must be given.

I regret that my investigations have forced me to this conclusion. It is always a delicate and embarrassing duty to render a decision that seems to overthrow the wish and will of a majority of the electors of any locality as expressed through the ballot-box. But duty must be bravely performed without fear or favor. Courts, if honest, cannot be expected to override well-established principles of law to obtain public approval, or to float along in a popular current.

If I am wrong, there are appellate tribunals to which the defendant may appeal and have the wrong corrected. Until this is done, I am quite willing to abide the consequences of fair, honest and legal criticism of the views herein expressed.

But I have no time or patience to notice the adverse criticism of newspaper scribblers, who are always heard from whenever a decision is made of this character, and whose only notions or knowledge of its soundness or unsoundness are founded upon the fact that it is or is not in accordance with their personal or partisan feelings.

It only remains, in conclusion, to ascertain whether the relator, Bush, is entitled to the office. I think, clearly not. He did not receive a majority of the votes of the legal electors who at that election cast ballots for the office of county judge, and consequently was not elected (*People* agt. *Clute*, 50 *N. Y.*, 451; *State* agt. *Giles*, 1 *Chandler* [ *Wis.*], 112; 2 *Pinney*, 166; *State* agt. *Smith*, 12 *Wis.*, 497).

The electors who voted for the defendant were legal electors, and exercised their right to vote for the office, so that their views upon it were expressed.

By reason of facts *aliunde*, these votes cannot be allowed to the defendant, as we have seen, or at least are of no avail

to him. In the *State* agt. *Tierney* (23 *Wis.*, 430) it was held "that, in *quo warranto* as to an elective office, the question is, whether the defendant at the election under which he claims received a majority of all the votes cast, which the canvassers had a right to count."

Applying this rule to the relator, it is clear he did not receive a majority of *such* votes.

In *Fish* agt. *Collins* (21 *Louisiana Ann.*, 280) it was held "that the election of a party to an office does not depend upon the ineligibility of his competitor, but upon the will of a majority or plurality of the legal voters of the district," (meaning, of course, the legal voters who exercised the right of suffrage). To same effect *Matter of Corliss* (11 *R. I.*, 638; 16 *Am. Law Reg., No.* 5, 15); *Renner* agt. *Bennett* (21 *Ohio St. R.*, 431); *People* agt. *Molitor* (23 *Mich.*, 341).

It is due to myself to state that, in view of the fact that the questions discussed in this opinion are interesting and important, and, so far as I can ascertain, never before the courts of this state for adjudication, I have given to them the most careful examination and extensive research. I have also presented them, without suggesting any impressions of my own to some of the ablest lawyers and jurists in the state, who have without exception (and some of them after an examination) concurred in the conclusions I have reached.