CHANCE et al. v. MISSISSIPPI STATE TEXTBOOK RATING AND PURCHASING BOARD et al.

(In Banc. February 24, 1941.)

[200 So. 706. No. 34417.]

454

Forrest B. Jackson, of Jackson, Luther A. Smith, of Hattiesburg, J. L. Taylor, of Gulfport, Hazelwood P. Farish, of Greenville, and Lee D. Hall, of Columbia, for appellants.

458

**Greek L. Rice,** Attorney-General, **E. R. Holmes, Jr.,** Assistant Attorney-General, and **Watkins & Eager,** all of Jackson, for appellees.

460

Argued orally by **Forrest B. Jackson**, for appellants, and by **W. H. Watkins** and **E. R. Holmes, Jr.**, for appellees.

**Alexander, J.,** delivered the opinion of the court.

Section 201 of the Constitution of Mississippi, 1890, is as follows: "It shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and, as soon as practicable, to establish schools of higher grade."

It is further provided in section 208 thereof: "No religious or other sect or sects shall ever control any part of the school or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school."

Chapter 202, Laws 1940, is an act to establish a State Textbook Rating and Purchasing Board, with power to select, purchase and distribute free textbooks by loaning same to the pupils through the first eight grades in all qualified elementary schools located in the state.

Section 23 of the act provides as follows:

"This act is intended to furnish a plan for the adoption, purchase, distribution, care and use of free textbooks to be loaned to the pupils in the elementary schools of Mississippi.

"The books herein provided by the board shall be distributed and loaned free of cost to the children of the first eight grades in the free public elementary schools of the state, and all other elementary schools located in the state, which maintain elementary educational standards equivalent to the standards established by the state department of education for the state elementary schools."

The act further provides, inter alia, that such textbooks as are selected and adopted by the board, "shall be uniform, and used as a basal textbook or books to the exclusion of all other basal textbook or books, except in case of readers where the equivalent of one full set may be bought in such proportions as desired, from a list of four. Nothing in this section shall be construed to prevent any school or schools from using supplementary books." Section 13.

It further provides that: "Any parent, person or school board in any community of the state may purchase books from the county superintendent of education or depository, who is given authority to sell books under the provisions of this act; provided, that the price of the books

so ordered or bought shall be paid in advance, said price to be the same as the contract price, plus whatever postage or delivery charges might accrue." Section 10.

Receipts from such sales become a part of the "state textbook fund," which, by section 15 of the act, shall consist of "the amount or amounts appropriated by the legislature for same, together with all monies accruing from the sale of disused books, all monies derived from the purchase of books by both public and private school trustees, by private individuals, all monies collected in damage suits under the terms of this act, or any other monies collected in any way whatsoever under the terms of this act."

Chapter 18, Laws of 1940, appropriates the sum of $1,250,000, "out of any money in the state treasury not otherwise appropriated, to the state textbook fund for the purpose of paying expenses of the Mississippi state textbook rating and purchasing board, and for the purchase of free textbooks," as provided by the act above referred to, creating such board.

It further provides that the books so furnished or loaned shall be protected by the pupils by covers furnished by the board. Among other powers of the board are the authority and duty of renovation, repair and fumigation of said books, as the need therefor arises through their use. Specimen copies of all textbooks so furnished are required to be kept available for public inspection.

An original and an amended bill were filed by the complainants. In the latter the complainants were described as "adult resident citizens of Forrest County, Mississippi, herein appearing as resident citizens, property owners and taxpayers of the state of Mississippi, for themselves and all other citizens, property owners and taxpayers of the state of Mississippi similarly situated and of the same class and kind who may desire to, and who are hereby requested, to join herein with said parties hereinabove referred to as complainants."

The defendants are the Mississippi State Textbook Rating and Purchasing Board, its executive secretary, and a legal depository, designated by the board.

The amended bill alleges that the complainants had applied to the Attorney General of the state to institute the suit to enjoin the defendants from distributing or loaning such textbooks to the pupils of certain named elementary schools which were not free public schools, as contemplated by section 201 of the Constitution of Mississippi of 1890. It is further alleged that the Attorney General not only declined to bring such suit on behalf of the taxpayers, but, on the contrary, had appeared as representative and counsel for the said board and its executive secretary.

It further alleges that said defendants, together with defendant depository, were preparing to distribute free textbooks, in accordance with section 23 of the Acts of 1940, to pupils in private and sectarian schools throughout the state.

The amended bill was set down for final hearing on bill and answer, and, disregarding matters alleged as conclusions of law, the following allegations constitute the basis of complainants' prayer for injunction: That requisitions for school books had been made by the proper superintendents of education for books to be loaned to pupils in thirteen private elementary schools in eleven localities, all of which "maintain elementary educational standards equivalent to the standards established by the state department of education for the state elementary schools;" that such requisitions were about to be honored by the defendants, and school books thereby loaned to such pupils. That the schools named are sectarian may not be doubted. Other allegations, although supplying material for extended arguments, respectively as to the baneful and beneficent aspects of such legislation, are not deemed appropriate to discuss.

The gist of the complaint is that said section 23 of the Laws of 1940 violates the spirit and letter of section 208

of the Mississippi Constitution of 1890. The injunction sought thereunder was denied, and the bill dismissed.

The defendants raise the question of the right of complainants to maintain the suit. As heretofore stated, the complainants are described as "adult resident citizens of Forrest county, Mississippi, herein appearing as resident citizens, property owners and taxpayers of the state of Mississippi for themselves and all other citizens, property owners and taxpayers of the State of Mississippi similarly situated and of the same class and kind who may desire to, and who are hereby requested, to join herein with said parties hereinabove referred to as complainants."

It is further alleged in the amended bill that complainants applied to the Attorney General of the state to bring the suit, and that he is the only public official authorized, as such, so to do. Moreover, it is shown that such official not only refused to do so, but, on the contrary, has appeared herein as representative and counsel for one of the defendants. His familiarity with the nature and purpose of the litigation furnishes an element which was absent in Mississippi Road Supply Co. v. Hester, 185 Miss. 839, 188 So. 281, 124 A. L. R. 574. That complainants have met the requirements of a taxpayers' suit is clear. McKee v. Hogan, 145 Miss. 747, 110 So. 775; Mississippi Road Supply Co. v. Hester, supra.

With reference to the main contention of complainants, it is noted that it does not concern the public policy or beneficent purposes of the act of 1940, ch. 202, nor its constitutionality as a whole. The attack is directed to section 23 thereof, which permits the loaning of free school books to pupils in the elementary grades of all schools, whether public or private, which maintain elementary education standards equivalent to the standards established by the State Department of Education for the state elementary schools. The contention leads directly to the inquiry whether (1) the appropriation under chapter 18, Laws 1940, constituting a textbook fund is

"a part of the school or other educational funds of this state;" and (2) whether compliance with said section 23 results in placing the "control of any part of the school or other educational funds of the state" in any "religious or other sect or sects;" and (3) whether such funds have been appropriated "toward the support of any sectarian school."

Although the act allows the loaning of such books to pupils in properly qualified private elementary schools, whether sectarian or not, the sectarian character of some of the schools whose pupils would be loaned school books is vigorously stressed in complainant's brief and argument, and some alarm is confessed by counsel lest this legislation be viewed otherwise than as a threat to the mutual independence of church and state.

The bases for such anxiety are founded upon considerations which bulked large in the minds and hearts of those who founded our republic, and who, in order to insure domestic tranquility and secure the blessings of liberty, established its Constitution with its restrictions, and the flag, which it follows, with its freedom.

Freedom of conscience was one of the blessings of liberty sought to be secured by constitutional separation of church and state. These principles are historical and fundamental. Yet it is quite true that while liberty is to be maintained at the price of eternal vigilance, such vigilance should include within its scope the common welfare of those who have the right to view educational opportunity as one of the "blessings of liberty."

Commendable zeal and scholarship have been exhibited by counsel in tracing the history of those principles which keep church and state mutually independent of control, one of the other. In accepting such constitutional safeguards as axiomatic we must recognize that the citizen is free not only in his conscience, but free to exhibit the fruits of his religious training in recognizing the needs of the citizen, and the right and duty of the state to minister to them.

Useful citizenship is a product and a servant of both the church and the state, and the citizen's freedom must include the right to acknowledge the rights and benefits of each, and to import into each the ideals and training of the other.

There is no requirement that the church should be a liability to those of its citizenship who are at the same time citizens of the state, and entitled to privileges and benefits as such. Nor is there any requirement that the state should be godless or should ignore the privileges and benefits of the church. Indeed, the state has made historical acknowledgment and daily legislative admission of a mutual dependence one upon the other.

It is the control of one over the other that our Constitution forbids. Sections 18, 208. The recognition by each of the isolation and influence of the other remains as one of the duties and liberties, respectively, of the individual citizen. It is not amiss to observe that by too many of our citizens the political separation of church and state is misconstrued as indicating an incompatibility between their respective manifestations, religion and politics. The state has a duty to respect the independent sovereignty of the church as such; it has also the duty to exercise vigilance to discharge its obligation to those who, although subject to its control, are also objects of its bounty and care, who, regardless of any other affiliation are primarily wards of the state. The constitutional barrier which protects each against invasion by the other must not be so high that the state, in discharging its obligation as parens patriae, cannot surmount distinctions which, viewing the citizen as a component unit of the state, become irrelevant.

The religion to which children of school age adhere is not subject to control by the state; but the children themselves are subject to its control. If the pupil may fulfil its duty to the state by attending a parochial school it is difficult to see why the state may not fulfil its duty to the pupil by encouraging it ''by all suitable means.'' The

state is under duty to ignore the child's creed, but not its need. It cannot control what one child may think, but it can and must do all it can to teach the child how to think. The state which allows the pupil to subscribe to any religious creed should not, because of his exercise of this right, proscribe him from benefits common to all.

If the safety of the republic is to remain the supreme law, the safety and welfare of the citizens who compose it must remain supreme. In obedience to this duty the state may and should supply the child with protection against physical disease and danger, and under our Constitution must encourage the promotion of intellectual and moral improvement. Such benefits, once made available by the state, may be demanded by the citizen or by any group of citizens.

In furnishing vaccine for its diseased, shelter for its needy, care for its insane, uniforms for its militia, and protection against "acts injurious to morals," the state recognizes needs that are physical, material, mental and moral, and recognizes them with a gaze which throws out of focus any credal background. Even as there is no religious qualification in its public servants for office, there should be no religious disqualification in its private citizens for privileges available to a class to which they belong.

It is well that counsel recognize the duty of the courts to avoid the dangers which the bitter experience of oppressed peoples led the framers of our Constitution to guard against. But such fear should beget caution and not panic. So long as we trace paths of duty clearly marked by accepted usage, and protected by delimiting and secure balustrades we may be safe from the pitfalls whose edge we skirt, and proceed with assurance even while we view their dangers.

Calm reason must not be stampeded by random cries of church or state or sectarian control, or by the din from the conflict of catechism and dogmatism. A wholesome sanity must keep us immune to the disabling ptomaine of

prejudice. If throughout the statute there are words which arrest the attention of over-sensitized suspicion and are seen by a jaundiced eye as symptoms of secular control, one may regain composure by viewing the state's book depository as a great public library of books available to all, which sells any book to anybody, and which, subject to reasonable regulation, allows the free use thereof to any child in any school. Cf. ch. 289, Laws 1938.

The freedom inherent in the mutual independence of the church and the state includes the right of the state to freedom from unwarranted hindrance in the name of religion. Eternal vigilance is not exhibited by injecting false issues into a question which concerns only the general welfare of all its citizens. In Board of Education, etc. v. Wheat, 174 Md. 314, 199 A. 628, 631, the free transportation by the state of school children to schools not receiving state aid was attacked under constitutional provisions similar to ours. The court held the use of funds for this purpose proper. In considering the public aspect of the service the court said: ''Whether it [the use of public funds] is private within that rule appears to be, finally, a question whether it is in furtherance of a public function in seeing that all children attend some school, and in doing so have protection from traffic hazards. School attendance is compulsory, and attendance at private or parochial schools is a compliance with the law. . . . The danger of perversion to private purposes may be admitted, but the Legislature is primarily entrusted with the care of that, and the courts have no duty in relation to it unless and until a perversion should be obvious. The fact that the private schools, including parochial schools, receive a benefit from it could not prevent the Legislature's performing the public function.''

The contention of appellants, as heretofore stated, is that the distribution of free school books to pupils in qualified private schools permits a diversion of public funds to private and also to sectarian uses, and allows control of public school funds by sectarian schools and

further that it permits the loaning or giving of public property and credit to private persons contrary to Constitution of Mississippi 1890, sec. 258. This contention does not want for support.

In Smith v. Donahue, 202 App. Div. 656, 195 N. Y. S. 715, 722, the constitutional provision involved was similar to our own. The statute construed, Education Law N. Y. Sec. 868, subd. 4, authorized the furnishing of "textbooks or other supplies to all the children attending the schools of such cities in which free textbooks or other supplies are lawfully provided prior to the time this act goes into effect." The court held to the view that the furnishing of such books and supplies was at best an indirect aid to the schools, and was "in violation of the true intent and meaning, of the Constitution." It can be seen that if it were necessary to differentiate the case as authority here, the furnishing of supplies in addition to books, as contrasted with the loaning of books with the right to compensation for damage or loss thereto, as in our statute, would furnish the necessary clue.

In Knowlton v. Baumhover, 182 Iowa 691, 166 N. W. 202, 207, 5 A. L. R. 841, cited by appellants to the use of public school funds to pay Catholic sisters who wore the distinctive dress of their church and who taught classes in the top floor of a building which adjoined a Catholic church, and which for all purposes was found to be such church, resulted in the exposure of the pupils to a proselyting influence, and thereby made available to such teachers an opportunity and encouragement "to teach or promote their peculiar religious notions." The court was influenced by the fact that the surroundings in which the students found themselves, and the pedagogical methods used were distinctly and perhaps deliberately sectarian. In O'Connor v. Hendrick, 184 N. Y. 421, 77 N. E. 612, 7 L. R. A. (N. S.), 402, 6 Ann. Cas. 432, the same reasoning led to upholding a regulation prohibiting teachers in public schools from wearing a distinctly religious garb while teaching. It may well be doubted whether

these decisions are here in point, inasmuch as in the instant case the loaning of books to pupils in all qualified private elementary schools lifts the accent from the incident of occasional sectarian control over a school as such, and keeps paramount its duty to educate, as provided by section 201 of our Constitution, and avoids the giving of any preference to any religious sect, as forbidden by its section 18. The Iowa court, moreover, approved constitutional provisions "forbidding religious exercises and religious teaching in all public schools," whereas our Constitution (section 18) prevents the exclusion of "the Holy Bible from use in any public school of this state."

State ex rel. Traub et al. v. Brown, 6 W. W. Harr. 181, 36 Del. 181, 172 A. 835, 837, deals with a statute appropriating funds for transportation of pupils attending free schools supported by any church or religious society outside the city of Wilmington. It was there held that, in furnishing such transportation, "it is not so clear that it [appropriation] is not made to be used by or in aid of such school." Its holding that the statute violated the Delaware Constitution, although in line with Judd v. Board of Education, etc., 278 N. Y. 200, 15 N. E. (2d) 576, 118 A. L. R. 789, and State ex rel. Van Straten v. Milquet, 180 Wis. 109, 192 N. W. 392, is met by contrary views in the Maryland case of Board of Education, etc. v. Wheat, 174 Md. 314, 199 A. 628.

Stress is placed upon Otken v. Lamkin, 56 Miss. 758, where a statute was held void because it attempted to devote the proportionate share of the school fund, to which each child in the state within the prescribed age is entitled, to the benefit of the private academies and colleges which the children may elect to attend in preference to free schools established by law. Such case is in point only in the event the appropriation made by chapter 18 of the Laws of 1940 constitutes "part of the school or other educational funds of this state," or "funds of this state," or "funds . . . appropriated

toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school.''

Other cases cited by appellants either deal with statutes which are clearly beyond the penumbra of doubt, or merely furnish suggested analogies to the case at bar.

The case of Borden v. Louisiana State Board of Education, 168 La. 1005, 123 So. 655, 660, 67 A. L. R. 1183, is in point. The constitutional and statutory provisions are for all practical purposes identical with ours. In holding valid a statute providing for the purchasing of school books for the use of the school children of the state in either public or private schools, the court said: ''In our opinion, which is the view of the majority of the court, these acts violate none of the foregoing constitutional provisions. One may scan the acts in vain to ascertain where any money is appropriated for the purchase of school books for the use of any church, private, sectarian, or even public school. The appropriations were made for the specific purpose of purchasing school books for the use of the school children of the state, free of cost to them. It was for their benefit and the resulting benefit to the state that the appropriations were made. True, these children attend some school, public or private, the latter, sectarian or nonsectarian, and that the books are to be furnished them for their use, free of cost, whichever they attend. The schools, however, are not the beneficiaries of these appropriations. They obtain nothing from them, nor are they relieved of a single obligation, because of them. The school children and the state alone are the beneficiaries. . . . As relates to the contention that the statutes violate section 12 of article 4 of the Constitution, we do not find this contention well founded. The school books are not granted or donated to the children. The donating of them would have been unnecessary to the accomplishing of the purpose of the statutes. It is only the use of the books that is granted to the children, or, in other words, the books are lent to them, which im-

plies that they are to be returned. While it is true that there is a lending here of things of value, belonging to the state, still this lending is not the lending prohibited by the Constitution. The lending there contemplated is a lending not connected with the reasonable exercise of the police power. . . . The furnishing of school books to the children of the state, for their use, in attending school, tends directly to promote the education of the children of the state and to obliterate illiteracy, thereby improving the morals of the children and promoting the general welfare and safety of the people, and hence comes within the police power. Cf. Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923.'' This case was followed in Cochran v. Louisiana Board of Education, 168 La. 1030, 123 So. 664. In reviewing the latter case on the federal question as to whether taxation for the purpose of providing such school books constituted a taking of private property for a private purpose, the Supreme Court of the United States (281 U. S. 370, 50 S. Ct. 335, 74 L. Ed. 913) said:

''The [Louisiana] court also stated, although the point is not of importance in relation to the Federal question, that it was 'only the use of the books that is granted to the children, or, in other words, the books are lent to them.'

''Viewing the statute as having the effect thus attributed to it, we cannot doubt that the taxing power of the state is exerted for a public purpose. The legislation does not segregate private schools, or their pupils, as its beneficiaries or attempt to interfere with any matters of exclusively private concern. Its interest is education, broadly; its method, comprehensive. Individual interests are aided only as the common interest is safeguarded.''

If the fact that the decisions of the Louisana courts were by a court divided four to three is of interest, it could be noted that the opinion in the opposing case of Judd v. Board of Education, supra, was decided by a similar division.

Now it is clear that our legislature, in enacting chapter 202 of the Laws of 1940 had in mind its constitutional duty "to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement . . .," the duty of educable children between seven and sixteen years to attend "a public day school, or to a private, denominational, or parochial day school," Code 1930, sec. 6716, and the need of furnishing aid to such children, in order to allow them to meet this duty of school attendance, and to have available to their use uniform textbooks. There is no contention that the books proposed to be furnished are sectarian in their content. They deal with subjects of health, democracy, good citizenship, history, as well as elemental studies in literature, science, geography, mathematics and language.

We are of the opinion that the appropriation in chapter 18 of the Laws of 1940 was not a use or diversion of school or other educational funds as contemplated by section 208, Mississippi Contitution of 1890, nor did it become a part thereof. The appropriation for schools is entirely separate, ch. 17, Acts of 1940. The use of the textbook fund constitutes no charge against any public school funds, properly so called, nor against any trust funds available for particular schools or educational purposes. Such funds are not appropriated "toward the support of any sectarian school," nor does the furnishing of such books to the pupils in properly qualified private schools constitute a pledging or loaning of the credit of the state "in aid of any person, association, or corporation" in contravention of section 258 thereof. The books belong to, and are controlled by, the state; they are merely loaned to the individual pupil therein designated; their preservation is fostered by exaction of suitable compensation for their loss or damage; the duty of protection through fumigation against contagion by use is assumed by the state.

The privilege of requisition by qualified private or sectarian schools for the loan of such books to its pupils

does not place in such school the "control [of] any part of the school or other educational funds" of the state. The mere availing of benefits of an appropriation lawfully made does not result in a control of such funds. Its use is controlled, only by the purpose for which the legislature designated it. Nor is the loaning of such books under such circumstances to the individual pupils a direct or indirect aid to the respective schools which they attend, although school attendance is compulsory. Such pupil is free to attend a proper public or private school, sectarian or otherwise. In discussing this phase the Court, in Board of Education v. Wheat, supra, said: "This conclusion that the act must be regarded as one within the function of enforcing attendance at school, renders it unnecessary to consider separately the objection that a religious institution is aided. Art. 36, Declaration of Rights. The institution must be considered as aided only incidentally, the aid only a byproduct of proper legislative action." The narrow construction contended for by complainants would compel the pupil to surrender use of his books when and because he elected to transfer from a public school to a qualified parochial school. Such would constitute a denial of equal privileges on sectarian grounds, and would be reminiscent of the language of Roger Williams, who, over a century before our national Constitution was written wrote in the royal charter of Rhode Island, "No person within the said colony at any time hereafter shall be in anywise molested, punished, or called in question for any difference of opinion in matters of religion."

The learned chancellor denied complainants' prayer for injunction against the loaning of such books to pupils in the named private sectarian schools. We must agree that the emphasis must be put upon the need of, and service to, the pupil, and that section 23 of the act of 1940 cannot, by straining its construction, be tortured into invalidity.

Affirmed.

SEPARATE OPINION.

**Smith, C. J.**, delivered a separate opinion.

I do not disagree with what is said in the opinion in chief on the merits of this case, but I disagree therewith in its holding that a taxpayer has the right to institute a suit to enjoin the enforcement of an act of the Legislature appropriating money from the state treasury. My views relative thereto are set forth by the Supreme Court of the United States in Frothingham v. Mellon, 262 U. S. 447, 486, 43 S. Ct. 597, 601, 67 L. Ed. 1078, 1084, better than I can do myself. In denying a taxpayer such a right, the court there, among other things, said: ''His interest in the moneys of the treasury—partly realized from taxation and partly from other sources—is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.''

DISSENTING OPINION.

**Anderson, J.**, delivered a dissenting opinion.

The question involved is not an open one. It was foreclosed by the decision of our court in Otken v. Lamkin, 56 Miss. 758. The statute involved in that case sought to divert a part of the public free school funds to pupils in private schools, which, of course, included sectarian schools. The court held that it violated Section 9 of Article 8 of the Constitution of 1869 which was in force at that time, which provided: ''No religious sect or sects, shall ever control any part of the school or university funds of this state.'' The statement of the case preceding the opinion is in this language: ''The plaintiff in error, on the 10th of February, 1879, filed a petition for a mandamus to compel the superintendent of education of Pike County to issue pay-certificates to two of the petitioner's children for their pro rata shares of the common-school fund of the county. The petition repre-

sented that the petitioner's children, aged eight and ten years, had been attending 'Lea Female College,' an institution of learning located in said county, and conducted in accordance with the provisions of an act of the Legislature, passed on the 5th of March, 1878, entitled 'An act to encourage the establishment of high-schools and colleges in this State;' and that they, as pupils of said institution, are entitled, under said legislative act, to their pro rata share of the common-school fund of the county, as though they had attended the free public school of the district; but that the county superintendent refused to issue to them pay-certificates for any portion of said fund. The defendant demurred to the petition; the demurrer was sustained, and the petitioner sued out a writ of error. The case presents the question of the constitutionality of the act of March 5, 1878, above referred to. The substance of the constitutional provisions involved, and the effect of the legislative act, are sufficiently stated in the opinion of the court.'' Paragraph two of the headnotes to this case contains an accurate summary of the opinion of the court. It follows: ''An act of the Legislature, passed March 5, 1878, entitled 'An act to encourage the establishment of high-schools and colleges in this State,' provides, in effect, that whenever a child has attended a private institution of learning, which has secured a suitable building and a library of two hundred bound volumes of miscellaneous literature, and is conducted by a teacher or teachers of good moral and educational standing, such child, whether the school so attended by him be within or without the school district in which he resides, may receive from the common-school fund the same pro-rata share thereof to which he would have been entitled if he had attended the public free school of his district. The act contains no requirement that the private institutions therein contemplated shall be free from sectarian or religious control, nor that they shall be under the supervision of the State or county superintendent of public education, nor that they shall be free from the charge of

tuition; but it does require that the pupils shall pay the tuition which may be exacted by the persons conducting the institutions; and, as it makes such institutions wholly private, the persons conducting them are permitted to exclude any pupils they may choose to reject. Held, that this act is in conflict with art. 8 of the State Constitution, and is therefore void."

The authorities to support the decision of the court are referred to in this manner: "If it needs adjudications and authorities to show that the scheme is violative of the letter and spirit of our organic law, they are abundant in other States, where, under constitutions substantially similar to ours, such schemes have uniformly been held unconstitutional. Gordon v. Cornes, 47 N. Y. [608] 616; State v. Springfield, 6 Ind. [83] 86; [People] v. Board of Education [of city of] Brooklyn, 13 Barb. (N. Y.) [400] 409; People v. Allen, 42 N. Y. 404; Halbert v. Sparks, 9 Bush (Ky.) [259] 260; Collins v. Henderson, 11 Bush (Ky.) [74] 76."

The holding of our court in that case is supported by the courts of other states having similar constitutional provisions in which the question has arisen, except in Louisiana in the case of Borden v. Louisiana State Board of Education, 168 La. 1005, 123 So. 655, 67 A. L. R. 1183. In that case by a divided court of four to three a similar statute was upheld. The courts holding to the contrary and in support of Otken v. Lamkin, in addition to those referred to in the opinion in that case, are the courts of New York, Iowa, Delaware, Kentucky, South Dakota, Nevada, Illinois, and Wisconsin, as shown in Smith v. Donahue, 202 App. Div. 656, 195 N. Y. S. 715; Judd v. Board of Education, 278 N. Y. 200, 15 N. E. (2d) 576, 118 A. L. R. 789; People ex rel. Lewis v. Graves, 245 N. Y. 195, 198, 156 N. E. 663, 664; People ex rel. Roman Catholic Orphan Society v. Board of Education, 13 Barb., N. Y., 400; Knowlton v. Baumhover, 182 Iowa 691, 166 N. W. 202, 5 A. L. R. 841; State ex rel. Traub et al. v. Brown, 6 W. W. Harr. 181, 36 Del. 181, 172 A. 835; Williams et

al. v. Stanton Common School District, 173 Ky. 708, 191 S. W. 507, L. R. A. 1917D, 453; Synod of Dakota v. State, 2 S. D. 366, 50 N. W. 632, 14 L. R. A. 418; State v. Hallock, 16 Nev. 373; Cook County v. Industrial School, 125 Ill. 540, 18 N. E. 183, 1 L. R. A. 437, 8 Am. St. Rep. 386; State ex rel. Van Straten v. Milquet, 180 Wis. 109, 192 N. W. 392.

The majority opinion holds that the Otken v. Lamkin case "is in point only in the event the appropriation made by chapter 18 of the Laws of 1940, constitutes 'part of the school or other educational funds of this state.' " If it was not appropriated for that purpose, what was the purpose? It appears to me to ask that question is to answer it. It is plainly a part of the scheme of public education; a plan to put the state in the place of the parents of the school children insofar as the cost of the textbooks are concerned. .

Both the Federal and the State Constitutions sought in unmistakable terms to provide for the complete separation of church and state. See Sections 18, 269, and 270, of our Constitution and Amendment 1 of the Constitution of the United States and Section 3 of Article 6 of the Constitution of the United States. The statute involved is a step in the direction of breaking down that separation.

The majority opinion in my judgment overrules Otken v. Lamkin without expressly so stating.