Delores **NORWOOD** et al., Plaintiffs,

v.

D. L. **HARRISON**, Sr., et al., Defendants.

Civ. A. No. WC 70–53–K.

United States District Court,
N. D. Mississippi, W. D.

April 17, 1972.

Melvyn Leventhal, Jackson, Miss., for plaintiffs.

William Allain, Asst. Atty. Gen., Jackson, Miss., for defendants.

Before COLEMAN, Circuit Judge, and KEADY and SMITH, District Judges.

## OPINION OF THE COURT

COLEMAN, Circuit Judge:

### I

### *The Nature of the Case*

This suit, a class action by Negro children attending the public schools, is brought through their parents as next friends.

The defendants are the members of the Mississippi State Textbook Purchasing Board and the Executive Secretary of that Board.

The gravamen of the complaint is that:

"Under the laws of the State of Mississippi, defendants select, purchase, distribute, loan and otherwise dispose of textbooks, in behalf of the State of Mississippi, for the use of children enrolled in the elementary and secondary schools in the State of Mississippi (Miss.Code Anno. Sections 6634 et seq.) * * *.

"Beginning with the 1964–65 school term * * * when the first school districts in Mississippi were required to integrate under freedom of choice * * * and through the present, numerous private schools and academies have been either formed or enlarged, which schools have established as their objective and/or have had the effect of affording the white children of the State of Mississippi racially segregated elementary and secondary schools as an alternative to racially integrated and otherwise non-discriminatory public schools.

"The defendants have provided these racially segregated schools and academies and the students attending such schools, either through sale or loan, textbooks purchased and owned by the State of Mississippi and have thereby provided state aid and encouragement to racially segregated education and have thereby impeded the establishment of racially integrated public schools in violation of plaintiffs' rights assured and protected by the Fourteenth Amendment to the Constitution of the United States."

Plaintiffs thus assert that defendants' lending of state-owned textbooks to children now attending racially segregated private schools situated within the State of Mississippi is violative of plaintiffs' Fourteenth Amendment rights and constitutes illegal state aid to racially segregated education. Plaintiffs empha-size that they do not challenge the right of students attending private schools, either sectarian or nonsectarian, to receive state-owned textbooks so long as the schools they attend were not organized in the wake of public school desegregation and do not engage in racially discriminatory admission practices, but as to students attending schools of the latter category, their claim is that the state may not validly provide them with free textbooks.

Plaintiffs pray an order requiring an accounting by defendants of all textbooks purchased from the State of Mississippi or on loan from the State of Mississippi to private schools and students enrolled therein; that defendants be directed immediately to recall, and otherwise assure the return to state depositories, of all textbooks used by students in attendance at private schools which have already been adjudged by other United States Courts as racially segregated and which have been formed for the purpose of providing white students with an alternative to racially integrated, non-discriminatory public schools; that the defendants be enjoined from further sale or distribution of such textbooks to any private schools or students enrolled therein without first notifying plaintiffs and obtaining court approval; and that defendants be enjoined from distributing state-owned textbooks to any private schools or students enrolled therein without first establishing that the school is racially integrated and has not had the effect of frustrating or impeding the establishment of racially integrated public schools.

Subject matter jurisdiction, not contested, is predicated upon 42 U.S.C., § 1983 and 28 U.S.C. § 1343(3) and (4).

## II

### Three-Judge Court Jurisdiction

Subsequent to the original filing of the complaint, plaintiffs submitted the following motion:

"Plaintiffs, pursuant to Jackson v. Choate, 404 F.2d 910 (5th Cir., 1968),

respectfully move this Court to certify this cause to the Chief Judge of the United States Court of Appeals for the Fifth Circuit to convene a Three-Judge District Court pursuant to 28 U.S.C., §§ 2281, 2284.

"We further move that the Three-Judge District Court thereafter determine whether this action should be litigated before it or a single district court judge."

In response thereto, the managing District Judge concluded that the complaint called for the convening of a Three-Judge District Court in accordance with 28 U.S.C. § 2284, and requested the Chief Judge of the Circuit to constitute a Court as contemplated by the statute. Thereafter, the Court was constituted.

The present views of the plaintiffs to the contrary notwithstanding, the Court is of the opinion that, sitting as a Three-Judge District Court, it has jurisdiction of this controversy.

Title 28 U.S.C., § 2281, provides:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284."

■ To authorize the convention of a Three-Judge Court the controversy must possess the following characteristics: (1) the constitutional question raised must be substantial; (2) a state statute or administrative order of general statewide application must be assailed as unconstitutional; (3) a state officer must be party defendant; and (4) injunctive relief must be sought. Idlewild Bon Voyage Liquor Corporation v. Epstein, 1962, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794; Hall v. Garson, 5 Cir., 1970, 430 F.2d 430, 442–443; Moore's Federal Practice, 1A., § 0.205; C. A. Wright, Law of Federal Courts, § 50 at 189 (2nd Ed. 1970).

■ This case meets these tests.

■ An injunction is sought against the enforcement by state officials of a state statute, § 6634, et seq., Mississippi Code, 1942,[1] and Board regulations.[2] The contention is that although

---

[1]. Section 6641(1) (a) Mississippi Code of 1942:

"The board shall have the power and is hereby authorized: (a) To promulgate rules and regulations for the purchase, care, use, disposal, distribution, and accounting for all books to be furnished under the terms of this act and to promulgate such other rules as may be necessary to the proper administration of this act."

Section 6656 Mississippi Code of 1942:

"Plan.—This act is intended to furnish a plan for the adoption, purchase, distribution, care and use of free textbooks to be loaned to the pupils in all elementary and high schools of Mississippi.

"The books herein provided by the board shall be distributed and loaned free of cost to the children of the free public schools of the state, and all other schools located in the state, which maintain educational standards equivalent to the standards established by the state department of education for the state schools.

[2]. The regulation for distribution of state-owned textbooks from 1940 through 1970 provided as follows:

"For the distribution of free textbooks the local control will be placed in the hands of the County Superintendent of Education. All requisitions for books shall be made through him and all shipments of books shall be invoiced through him. At his discretion he may set up certain regulations governing the distribution of books within the county, such regulations not to conflict with the regulations adopted by the State Textbook Board or provisions of the Free Textbook Act."

The above regulation was revised on October 14, 1970, to read as follows:

"*Public Schools.* The administration of the textbook program in the public schools shall be the responsibility of the

the statute requires the free lending of textbooks to *all educable children*, it should not include those attending private, racially segregated schools. Plaintiffs say that they do not object to other educable children receiving the books. Thus it is argued that they are not claiming the statute to be altogether unconstitutional but they are only challenging the constitutionality of its application. Since, however, the statute specifically provides that *all* children shall receive the books and this Court has no authority to amend that language, we must consider the complaint as an attack on the statute as written. Our jurisdiction, of course, extends to a consideration of whether a facially valid statute has been unconstitutionally applied by officers in charge of its enforcement.

As to substantiality, see Ex Parte Poresky, 1933, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152, 153; Local Union No. 300, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO v. McCulloch, 5 Cir., 1970, 428 F.2d 396, 399–400.

■ Contrary to the position taken by defendants, we hold that these plaintiffs, black children who are attending the public schools, have standing to prosecute this complaint, Chance v. Mississippi State Textbook Rating & Purchasing Board, 1941, 190 Miss. 453, 200 So. 706; Association of Data Processing Service Organizations, Inc. v. Camp, 1970, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; Barlow v. Collins, 1970, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192.

### III

### The Merits

Near the close of the Great Depression, Governor Paul B. Johnson, Sr. on January 16, 1940, delivered his Inaugural Address to a joint session of the Mississippi Legislature.[3] He said that 75,000 children in Mississippi were without textbooks, that all states surrounding Mississippi gave free textbooks to each child in those states, that the failure to provide free textbooks to the children of Mississippi was "an indictment of our state government", and that the State should furnish free textbooks to all educable children in the elementary grades.

The result of this appeal was the enactment of Chapter 202 of the General Laws of the State of Mississippi of 1940, approved February 16, 1940, now codified as indicated supra, by which a textbook purchasing board was established. The board was cloaked with authority to select, purchase, distribute, and care for *free textbooks* in *all* schools in the State, through the first eight grades.

In his message to the Legislature on January 7, 1942,[4] Governor Johnson recommended that the free textbook program be extended to high school students. This resulted in the enactment of Chapter 152 of the General Laws of Mississippi of 1942, approved March 23, 1942, also codified as above, by which the program was extended to include high school students.

The program had not long been in existence, however, before a state court

---

administrative heads of the county units, consolidated districts, and municipal separate districts set up by the Legislature. All textbook transactions between the public schools and the State shall be carried on through them. It shall be the duty of these local custodians to render all reports required by the State; to place orders for textbooks for the pupils in their schools; . . .

"*Private Schools.* Private and parochial school programs shall be the

responsibility of the State Textbook Board. All textbook transactions will be carried out between the Board and the administrative heads of these schools. Their duties shall be the same as outlined above for public schools."

3. Mississippi House Journal, 1940, page 42.

4. Mississippi House Journal, 1942, page 52.

suit was filed to enjoin the Textbook Purchasing Board from distributing free textbooks to private and sectarian schools. This was a taxpayers' suit, complaining that textbooks were about to be requisitioned by and loaned to pupils in thirteen private elementary schools, all of which were sectarian, and that the issuance of such books for the free use of students in sectarian schools would be a violation of § 208 of the Mississippi Constitution of 1890.

Section 208 provides that:

"No religious or other sect or sects shall ever control any part of the school or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school."

In a 5–1 decision, the Supreme Court of Mississippi upheld the legality and the constitutionality [under § 208] of providing free textbooks to students in private, sectarian institutions.

In an opinion written by the late [and we may justifiably say, great] Justice Julian P. Alexander, Sr., the Mississippi Supreme Court spoke the following:

"Although the act allows the loaning of such books to pupils in properly qualified private elementary schools, whether sectarian or not, the sectarian character of some of the schools whose pupils would be loaned school books is vigorously stressed in complainant's brief and argument, and some alarm is confessed by counsel lest this legislation be viewed otherwise than as a threat to the mutual independence of church and state.

"The bases for such anxiety are founded upon considerations which bulked large in the minds and hearts of those who founded our republic, and who, in order to insure domestic tranquility and secure the blessings of liberty, established its Constitution with its restrictions, and the flag, which it follows, with its freedom.

"Freedom of conscience was one of the blessings of liberty sought to be secured by constitutional separation of church and state. These principles are historical and fundamental. Yet it is quite true that while liberty is to be maintained at the price of eternal vigilance, such vigilance should include within its scope the common welfare of those who have the right to view educational opportunity as one of the 'blessings of liberty.'

\* \* \* \* \* \*

"There is no requirement that the church should be a liability to those of its citizenship who are at the same time citizens of the state, and entitled to privileges and benefits as such. Nor is there any requirement that the state should be godless or should ignore the privileges and benefits of the church. Indeed, the state has made historical acknowledgment and daily legislative admission of a mutual dependence one upon the other.

"It is the control of one over the other that our Constitution forbids. Sections 18, 208. The recognition by each of the isolation and influence of the other remains as one of the duties and liberties, respectively, of the individual citizen. It is not amiss to observe that by too many of our citizens the political separation of church and state is misconstrued as indicating an incompatibility between their respective manifestations, religion and politics. The state has a duty to respect the independent sovereignty of the church as such; it has also the duty to exercise vigilance to discharge its obligation to those who, although subject to its control, are also objects of its bounty and care, and who, regardless of any other affiliation are primarily wards of the state. The constitutional barrier which protects each against invasion by the other must not be so high that the state, in discharging its obligation parens patriae, cannot surmount distinctions which, viewing the citizen as a component unit of the state, become irrelevant.

"The religion to which children of school age adhere is not subject to control by the state; but the children themselves are subject to its control. If the pupil may fulfil its duty to the state by attending a parochial school it is difficult to see why the state may not fulfil its duty to the pupil by encouraging it 'by all suitable means.' The state is under duty to ignore the child's creed, but not its need. It cannot control what one child may think, but it can and must do all it can to teach the child how to think. The state which allows the pupil to subscribe to any religious creed should not, because of his exercise of this right, proscribe him from benefits common to all.

"If the safety of the republic is to remain the supreme law, the safety and welfare of the citizens who compose it must remain supreme. In obedience to this duty the state may and should supply the child with protection against physical disease and danger, and under our Constitution must encourage the promotion of intellectual and moral improvement. Such benefits, once made available by the state, may be demanded by the citizen or by any group of citizens.

\* \* \* \* \* \*

"Calm reason must not be stampeded by random cries of church or state or sectarian control, or by the din from the conflict of catechism and dogmatism. A wholesome sanity must keep us immune to the disabling ptomaine of prejudice. If throughout the statute there are words which arrest the attention of over-sensitized suspicion and are seen by a jaundiced eye as symptoms of secular control, one may regain composure by viewing the state's book depository as a great public library of books available to all, which sells any books to anybody, and which, subject to reasonable regulation, allows the free use thereof to any child in any school. Cf. ch. 289, Laws 1938.

\* \* \* \* \* \*

"We are of the opinion that the appropriation in chapter 18 of the Laws of 1940 was not a use or diversion of school or other educational funds as contemplated by section 208, Mississippi Constitution of 1890, nor did it become a part thereof. The appropriation for schools is entirely separate, ch. 17, Acts of 1940. The use of the textbook fund constitutes no charge against any public school funds, properly so called, nor against any trust funds available for particular schools or educational purposes. Such funds are not appropriated 'toward the support of any sectarian school,' nor does the furnishing of such books to the pupils in properly qualified private schools constitute a pledging or loaning of the credit of the state 'in aid of any person, association, or corporation' in contravention of section 258 thereof. The books belong to, and are controlled by, the state; they are merely loaned to the individual pupil therein designated; their preservation is fostered by exaction of suitable compensation for their loss or damage; the duty of protection through fumigation against contagion by use is assumed by the state.

\* \* \* \* \* \*

"Nor is the loaning of such books under such circumstances to the individual pupils a direct or indirect aid to the respective schools which they attend, although school attendance is compulsory. Such pupil is free to attend a proper public or private school, sectarian or otherwise."

The judgment of the Chancery Court of Hinds County, Mississippi, denying the injunction, was affirmed. Chance v. Mississippi State Textbook Rating & Purchasing Board, 1941, 190 Miss. 453, 200 So. 706.

This 1941 decision of the Supreme Court of Mississippi seems generally to be in accord with one delivered twenty-seven years later by the Supreme Court of the United States in Board of Education of Central School District No. 1 v. Allen, 1968, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060.

In that case a New York statute requiring school districts to purchase and

loan textbooks to students enrolled in parochial as well as in public and private schools was under constitutional attack. The Supreme Court held that the New York statute did not constitute a "law respecting an establishment of religion, or prohibiting the free exercise thereof" in conflict with the First and Fourteenth Amendments to the Constitution of the United States. We quote from the opinion in *Allen,* supra:

"Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), is the case decided by this Court that is most nearly in point for today's problem. New Jersey reimbursed parents for expenses incurred in busing their children to parochial schools. The Court stated that the Establishment Clause bars a State from passing 'laws which aid one religion, aid all religions, or prefer one religion over another,' and bars, too, any 'tax in any amount, large or small * * * levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.' 330 U.S., at 15–16, 67 S.Ct., at 511. Nevertheless, said the Court, the Establishment Clause does not prevent a State from extending the benefits of state law to all citizens without regard for their religious affiliation and does not prohibit 'New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools.' The statute was held to be valid even though one of its results was that 'children are helped to get to church schools' and 'some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets.' 330 U.S., at 17, 67 S.Ct., at 512. As with public provision of police and fire protection, sewage facilities, and streets and sidewalks, payment of bus fares was of some value to the re-

ligious school, but was nevertheless not such support of a religious institution as to be a prohibited establishment of religion within the meaning of the First Amendment.

\* \* \* \* \* \*

"The express purpose of § 701 was stated by the New York Legislature to be furtherance of the educational opportunities available to the young. Appellants have shown us nothing about the necessary effects of the statute that is contrary to its stated purpose. *The law merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools.* Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in *Everson* and does not alone demonstrate an unconstitutional degree of support for a religious institution." [Emphasis ours].

To be specific, the racial identity of the child had nothing to do with the original enactment of the Mississippi statute nor has it had anything to do with the receipt of a free textbook throughout a period of more than thirty years. Every Mississippi school pupil, before and since 1954, the date of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, whether enrolled in public, private, or parochial schools, of whatever race, has received the free textbooks without question or impediment.

■ Plaintiffs say, however, that furnishing the textbooks free to those students who now choose to attend racially segregated private schools, established in Mississippi since 1964 for the purpose of affording a child an opportunity of not attending integrated public schools, is unconstitutional because it

conflicts with the "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch", Green v. County School Board of New Kent County, 1968, 391 U.S. 430, at 437, 88 S.Ct. 1689, at 1694, 20 L.Ed.2d 716.

In line with this position plaintiffs say (Brief, p. 25) "We challenge this statute to the extent that it requires or authorizes the distribution of state-owned textbooks to schools formed for the purpose of having the effect of providing whites with an alternative to public integrated education."

The evidence establishes that 34,000 students are presently receiving state-owned textbooks while attending 107 all-white, nonsectarian private schools which have been formed throughout the state since the inception of public school desegregation.[5] This number is to be compared with 534,500 students in more than 1,000 public schools and 12,100 students in desegregated parochial schools who are receiving free textbooks. It is plain, however, that the books have not been issued to the schools but to the students. As in the case of public schools, private and sectarian school authorities are held responsible for the books as a matter of orderly administration. The statute does not authorize the distribution of the books to schools, only to pupils.

We are thus brought to the point of determining whether the state's furnishing of free textbooks to students attending racially segregated schools is a support of such schools, for whose promotion and encouragement public funds, of course, may not be constitutionally provided. In terms of the unequivocal prohibition contained in the First Amendment, made applicable to the states by the Fourteenth Amendment, the question has been clearly settled. Free textbooks to the students is not a financial benefit to the church-related schools, as held in *Allen,* and is not a direct or an indirect aid to such schools, as held in *Chance.* In the recent case of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, the United States Supreme Court continued to recognize the distinction between permissible state aid to the student and impermissible state aid to the church-related school, and invalidated a Pennsylvania statute which undertook to provide financial aid directly to church-related schools.

The essential inquiry, therefore, is whether we should apply a more stringent standard for determining what constitutes state aid to a school in the context of the Fourteenth Amendment's ban against denial of the equal protection of the law than the Supreme Court has applied in First Amendment cases. On the record made before us we perceive neither the logic nor the necessity for applying any different test to a universally free school textbook program.

Plaintiffs rely primarily upon Coffey v. State Educational Finance Commission, 296 F.Supp. 1389 (S.D., Miss., 1969); Poindexter v. Louisiana Financial Assistance Commission, 275 F.Supp. 833 (E.D., La., 1967); Griffin v. State Board of Education, 296 F.Supp. 1178 (E.D., Va., 1969); and Green v. Kennedy, 309 F.Supp. 1127 (D.C., 1970), appeals dismissed for want of jurisdiction, sub nom Cannon v. Green, 398 U.S. 956, 90 S.Ct. 2169, 26 L.Ed.2d 539 (1970), and Coit v. Green, 400 U.S. 986, 91 S.Ct. 460, 27 L.Ed.2d 435 (1971); continued as Green v. Connally, 330 F.Supp. 1150 (D.C., 1971); affirmed sub nom Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). These cases, which are clearly distinguishable on their facts, are not in point on the present issue.

In *Coffey* it was held that state tuition grants to students attending private segregated schools, first begun in 1964, and which in three years time was fol-

---

5. An additional 8,000 students are enrolled in 41 private, nonsectarian schools which do not participate in the state textbook program.

lowed by an increase in private non-sectarian schools from three to forty eight in number, were "critical to most of the schools", 296 F.Supp. at 1392. The Court further found "that the tuition grants have fostered the creation of private segregated schools * * * encourages, facilitates, and supports the establishment of a system of private schools operated on a racially segregated basis as an alternative available to white students seeking to avoid desegregated public schools * * * [and] that the grants 'tend in a determinative degree to perpetuate · segregation' ". Therefore, the grants, and the Mississippi statute which authorized them, were struck down as violative of the equal protection clause of the Fourteenth Amendment.

The Court further pointed out:

"There is no claim in this case that the constitution requires all children to attend public schools, or that a private citizen may not select a private segregated school for his child because of a desire to keep the child from being educated with children of a different race. What is involved here are legislative enactments which 'will significantly encourage and involve the State in private discriminations.' Reitman v. Mulkey, 387 U.S. 369, 381, 87 S.Ct. 1627, 1634, 18 L.Ed. 2d 830, 838 (1967)."

Similar tuition grant cases from other states are collated in Footnote 1 to Coffey, 296 F.Supp., at 1390, and will not be cited here.

Similarly in Poindexter a statute providing for tuition grants to pupils attending private segregated schools was invalidated. The Court held that any affirmative and purposeful state aid promoting private discrimination violates the equal protection clause, a state cannot legitimately be just a little bit discriminatory, and that the object or purpose of legislation is to be determined by its natural and reasonable effect. In speaking for the Court, Judge Wisdom wrote:

" * *. * [a]ny aid to segregated schools that is the product of the State's affirmative, purposeful policy of fostering segregated schools and has the effect of encouraging discrimination is significant state involvement in private discrimination. (We distinguish, therefore, state aid from tax benefits, free schoolbooks, and other products of the State's traditional policy of benevolence toward charitable and educational institutions.)" 275 F.Supp. 854.

The United States Supreme Court affirmed, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968).

The result of this decision was that Louisiana enacted a revised tuition grant law. This statute, too, was invalidated by a subsequent Three-Judge Court. Poindexter v. Louisiana Financial Assistance Commission, D.C., 296 F.Supp. 686. Judge Wisdom again wrote:

"The free lunches and textbooks Louisiana provides all children in public and private schools are the fruits of a benevolent racially neutral policy."

Again the United States Supreme Court affirmed, Louisiana Ed. Commission for Needy Children v. Poindexter, 393 U.S. 17, 89 S.Ct. 48, 21 L.Ed.2d 16 (1968).

In Griffin, a three-judge district court invalidated Virginia's statute allowing tuition grants to children attending segregated schools. Expressly adopting Judge Wisdom's reasoning in Poindexter, the Court held the statute impermissibly provided for payments to children who may expend such funds for a segregated classroom, thereby "giving life to an educational forum decried by the Federal Constitution." 296 F.Supp. at 1181.

The tuition grant cases, which emphasize the financial support thereby afforded to educational institutions, rest upon wholly different considerations from the case sub judice. Here we are concerned only with the act of furnish-

ing a state-owned textbook to the student.

Finally the *Green* case, upon which plaintiffs place great reliance, involved the grant of federal tax exempt status and deductibility of contributions to *private segregated schools* in Mississippi. The *Green* Court emphasized that, apart from tax exemption to the schools, the deductions from income taxes by individuals and corporations who make contributions to racially segregated private schools amounted to substantial and significant governmental support for the segregated private school pattern. Thus the exemptions were held invalid as against federal public policy without reaching constitutional issues.

We find no federal decision which has suggested the invalidation of the beneficient policy of a state to furnish textbooks to all of the educable children. within its borders. To the contrary, under settled case law, the state's legitimate interest in the education of its youth, in whatever school the student or his parents may select, is a proper and adequate basis upon which the state may administer its free textbook program.

It has already been demonstrated that in Mississippi the free textbook program began without racial motivation and the books have long been uniformly supplied to all children alike, regardless of race, in both public and private schools. Only one prerequisite must be satisfied for the student who attends a private school, i. e., the school shall maintain educational standards equivalent to those established by the State Department of Education for public schools. In fact, plaintiffs concede that Mississippi has historically maintained a benevolent and racially neutral policy in the administration of its state-owned textbook program.

We find it wholly illogical to require an alteration in the state's textbook program simply because of the advent of more private schools following the desegregation of the public school system. Depriving any segment of school children of state-owned textbooks at this point in time is not necessary for the establishment or maintenance of state-wide unitary schools. Indeed, the public schools which plaintiffs acknowledge were fully established as unitary schools throughout the state no later than 1970–71, continue to attract 90% of the state's educable children. There is no showing that any child enrolled in private school, if deprived of free textbooks, would withdraw from private school and subsequently enroll in the public schools, now unitary. We are mindful of the fact that children are free to attend private schools of their choice, for whatever reason satisfactory to them and to their parents. See the concurring opinion of Mr. Justice Brennan in School District of Abington Township, Pa. v. Schempp, 374 U.S. 203, at 242, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

There could be considerable doubt about the constitutionality, under the equal protection clause, of a program which would provide free books to some children while denying them to others. Providing schools to some children and denying others access to those schools solely for racial reasons was held invalid in Brown v. Board of Education, *supra.*

Plaintiffs say that furnishing the free textbooks to pupils in private schools encourages attendance at such institutions. This, of course, is conjectural, as there is no substantial proof on that score. It occurs to us, however, that if encouragement alone is a sufficient test and if impermissible encouragement necessarily follows from the issuance of the books and subsequent attendance at a particular school, then the books may not be issued to those attending private sectarian schools (something which the Supreme Court has thus far declined to invalidate).

Since the issuance of free textbooks to students attending private schools has failed to defeat the establishment of a state-wide unitary school system in Mississippi, and since plaintiffs are themselves receiving their free textbooks, there is serious question as

to whether plaintiffs are threatened with the irreparable injury which is prerequisite to injunctive relief. Federal judicial power is to be exercised to strike down legislation, whether state or federal, only if a plaintiff is himself immediately harmed, or immediately threatened with harm, by the challenged action, Poe v. Ullman, 1961, 367 U.S. 497, 504, 81 S.Ct. 1752, 6 L.Ed.2d 989.

Lurking beneath all this is the principle that two wrongs do not make a right. Punitive action against the children now receiving free textbooks in the private schools will do nothing to cure acts committed by others (not children) in the years now dead and gone.

We hold that the free textbook program and the Mississippi statutes authorizing it, for the consideration herein recited, are not constitutionally invalid.

This opinion constitutes both our findings of fact and conclusions of law.

The complaint is dismissed and judgment will be entered accordingly.